**COURTLAND MANOR, INC., a Delaware Corporation, Plaintiff,**

**v.**

**Leonard S. LEEDS, as the General Partner of Courtland Manor Associates, a Delaware Limited Partnership, et al., Defendants.**

**Bertram N. WIDDER and Courtland Manor, Inc., a Delaware corporation, Plaintiffs,**

**v.**

**Leonard S. LEEDS and William V. Leeds, Defendants.**

Court of Chancery of Delaware, New Castle.

Submitted June 5, 1975.

Decided Oct. 30, 1975.

Peter J. Shanley, of Murdoch & Walsh, Wilmington, for plaintiffs.

Bruce M. Stargatt, and Sydney R. Chirlin, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendants.

BROWN, Vice Chancellor.

This is a decision after trial in two consolidated actions brought by Courtland Manor, Inc., a Delaware corporation,

(hereafter "the corporation") against Leonard S. Leeds and his father, William V. Leeds, individually, and also against Leonard Leeds as general partner of Courtland Manor Associates, a limited partnership (hereafter "the partnership") and Courtland Manor Associates itself. In one action the corporation was joined as a plaintiff by Bertram N. Widder, a stockholder and officer of the corporation and also a limited partner in the partnership. The initial allegations and relief sought were widespread. As the result of a six-day trial, however, it appears that the issues have narrowed down to three separate premises on which the corporation seeks money damages based on alleged misconduct by the defendant Leonard Leeds during a period when he was president, treasurer and, for all practical purposes, the managing officer of the corporation as well as general partner of the partnership. In view of this, I treat the action as being one brought by the corporation in its own name for the purpose of this decision, and I accord no particular significance to the status of Dr. Widder as a nominal plaintiff.

The testimony and documentary evidence presented is complex, but due to the fact that it is my opinion that the plaintiff corporation is not in a position to recover the damages it now seeks, a detailed analysis of the factual contentions of the parties is unnecessary. A cursory statement of the significant events will suffice.

Prior to 1967, William Leeds had successfully operated a nursing home in the Wilmington area and his son, Leonard, had worked with him for some two years. In 1967, Leonard became interested in the possibility of establishing a nursing home in the Dover area on land he ultimately obtained for that purpose. The need for an 87 bed facility in that area was confirmed by the State Board of Health, and upon the joint application of Leonard Leeds and his father, financing assistance for the construction of a new nursing home was obtained through the Federal Housing Authority.

With the aid of Leeds's accountant, Samuel London, the project was structured so that the nursing home, when completed, would be operated by a corporation while the actual construction and ownership of the facility would be accomplished through the limited partnership. The corporation was formed and investors were sought among the friends and clients of Leonard Leeds and London based on written projections indicating the income that the corporation should derive at 75 per cent, 90 per cent and 100 per cent occupancy levels. During the spring and summer of 1968, nine individuals, including the plaintiff Widder, contributed $70,000 to the corporation in return for stock valued at $1,000 per share. All nine, along with Leonard Leeds, were made directors of the corporation. Leonard Leeds was elected president and treasurer, Widder was elected secretary and London was elected assistant secretary. All stockholders were informed through written materials that the anticipated construction cost to the owner would be some $900,000 and that the rental rate that the corporation would pay, which was established by London based on the consideration that the landlord would assume all property taxes, insurance, water service and exterior maintenance, would be 12½ per cent of that figure per year, or approximately $112,000.

After some difficulty, the limited partnership was formed with Leonard Leeds owning 29.5 per cent as a general partner and William Leeds owning 40.5 per cent as a limited partner. The remaining 30 per cent limited partnership interest was sold to others, three of whom, including the plaintiff Widder, were also stockholder-directors of the corporation.

In order to meet FHA requirements, a draft lease was prepared and circulated among the stockholder-directors. At least one meeting of the group was held to discuss the lease, and one stockholder had it

reviewed by his own attorney. As a result, certain changes were agreed upon, one of which established that the rental rate would be 12½ per cent of the total cost of construction to the partnership, but not to exceed $150,000 per year. By this time, Leonard Leeds was representing that the rent might approach $125,000 per year. The lease was executed on November 6, 1968, with Leonard Leeds signing on behalf of the partnership.

By June 1970, with Leonard Leeds running the operation while drawing a salary from the corporation, the home was completed and patients accepted for care. However, things did not go as well as anticipated and the corporation experienced a severe cash shortage. Matters worsened over the summer of 1970 and the operation fell into disarray. As a result, Leonard Leeds became severed from the corporation and, in October 1970, the plaintiff Widder, who was already a stockholder and director, together with a Mr. Joseph and a Mr. Murdoch, acquired control of the corporation by purchasing most of the existing stock for approximately $4,000, a fraction of its initial cost. On October 27, 1970, these three elected themselves directors of the corporation and authorized the issuance of additional shares of stock at $10 per share, with each purchasing 500 shares. Thus, for an outlay of some $19,000 they ended up with virtually all of the stock of the corporation which represented a total investment of some $90,000. Ten days later, on November 6, 1970, they caused the corporation to file the first of these consolidated suits against Leonard Leeds and the partnership. The second suit followed some three months later with Widder being joined as a plaintiff and William Leeds being named as a defendant along with Leonard.

As now sifted down, the corporation seeks judgment against Leonard Leeds individually for $45,377. The basis for this claim is that the lease engineered by Leonard Leeds was unfair to the corporation and excessively favorable to the partnership. The ultimate cost of construction exceeded $1.1 million and the annual rent, thus, approached $142,000 per year. Because of this the annual profit to the partnership-landlord exceeded $30,000 when initially it was anticipated that this figure would be some $7,000 annually. It is charged that the shortage of working capital which caused the failure of the corporate operation is attributable in large part to the excessive rent requirements of the lease, and that Leonard Leeds, as president of the corporation and general partner of the partnership, stood on both sides of the transaction with regard to the negotiation and execution of the lease between the two legal entities he then controlled. As such, it is argued that under the rule of *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952), and *Johnston v. Greene*, Del.Supr., 35 Del.Ch. 479, 121 A.2d 919 (1956), Leonard Leeds bears the burden of showing the fairness of the lease to the corporation to which he owed the fiduciary duty which, under the evidence, he has not done. It is further charged that he withheld a project analysis prepared by FHA from which the other shareholder-directors, if they had known of it, would have realized in advance that the corporation would not have sufficient working capital left under the terms of the lease. Defendants dispute this, offering evidence to show that the lease was fair to the corporation as well as the partnership based on the high risk nature of the corporate enterprise and the large investment in a single purpose building. They also dispute the accuracy and worth of the FHA analysis.

The corporation also seeks judgment against the partnership for $20,393, or some major portion thereof, for rent paid by the corporation from March 19, 1970, through June 2, 1970. It is contended that the lease provided for the commencement of rental payments only as of the date the facility was certified as completed by the partnership's architect, which was not

forthcoming until June 3, 1970. However, as of March 19, 1970, Leonard Leeds decided to start accepting a few patients since one wing of the home was completed and usable. He also decided, without consulting any of the other stockholder-directors, that the corporation should start paying rent as of that time, even though a total of less than 20 patients were accepted prior to the month of June. The plaintiff corporation now charges that it was improper for Leeds to take this action on behalf of his partnership, and that consequently the rent so paid, or at least a substantial part of it, should be returned.

Finally, it appears that from the $70,000 initially contributed by the original shareholders for their stock, Leonard Leeds, from time to time, made draws upon it for partnership purposes to the extent of more than $61,000. Among other things, he paid the partnership's $2,000 FHA examination fee and $19,000 mortgage finder's fee from these funds. Although all sums were returned, the corporation contends that it is entitled to interest from the partnership for the period it used such sums at a rate to be fixed by the Court.

Having thus summarized the factual issues, I reiterate that I find it unnecessary to rule upon them, and I take this position because I feel that the underlying theory of the plaintiff's case runs afoul of the equitable principles most recently affirmed by the United States Supreme Court in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974).

There, in dwelling upon the rationale set forth by Roscoe Pound in *Home Fire Insurance Co. v. Barber*, 67 Neb. 644, 93 N.W. 1024 (1903), the Court noted the settled equitable principle that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the wrongful transaction. The basis for this rule is that where share-

holders have purchased all or substantially all of the shares of a corporation at a fair price, they have personally sustained no injury from wrongs which occurred prior to their purchase, and consequently, any recovery on their part for such prior wrongs would constitute a windfall and would enable such shareholders to obtain funds to which they had no just title or claim. In addition, to allow recovery to subsequent shareholders for prior wrongs would permit them to recoup a large part of the price they agreed to pay for their shares even though they had received all they had bargained for. Finally, to allow recovery would be to permit after-acquiring shareholders to profit from wrongs done to others, and thus encourage speculative litigation.

Similarly, our courts have recognized the basic principle that one who acquires his stock from a shareholder who participated in or acquiesced in a corporate wrong lacks the capacity himself to complain of it. *Henderson v. Plymouth Oil Co.*, Del.Ch., 15 Del.Ch. 40, 131 A. 165 (1925); *Goodman v. Futrovsky*, Del.Supr., 42 Del.Ch. 468, 213 A.2d 899 (1965).

The Court went on to hold in *Bangor Punta* that where equity would preclude individual shareholders from maintaining an action in their own right for wrongs occurring to the corporation prior to the acquisition of their stock, it is also proper to disregard the corporate form so as to preclude after-acquiring shareholders from circumventing this rule by bringing the same action in the name of the corporation.

In *Bangor Punta*, although suit was brought in the name of the corporation against its previously controlling shareholder, it was noted that the real party who would benefit from a recovery was the 99 per cent shareholder of the corporation who had obtained 98.3 per cent of its stock from the former shareholder whose previous managerial activities the suit

sought to challenge. The Court noted that the 99 per cent shareholder acquired its 98.3 per cent interest for $5 million and thereafter caused the corporation to seek damages against its vendor in the sum of $7 million for corporate mismanagement. Thus, a recovery by the corporation would, in effect, provide the 99 per cent shareholder with a windfall by recouping its purchase price plus $2 million and thus permit it to realize far more than the fair value of the stock that it bargained for at the time of purchase. It was concluded that the overriding public policy enunciated by Dean Pound in *Home Fire Insurance* required that the corporate fiction be disregarded and that under equitable principles the corporation be precluded from maintaining the action.

While the facts in this case are not identical to those in *Bangor Punta,* I think that the applicable rationale is the same. Here the corporation is not bringing suit against the parties from whom the now controlling shareholders acquired their majority stock ownership. Nonetheless, the basis for all three of its surviving claims is mismanagement and breach of fiduciary obligation by the president and managing officer of the corporation as elected by the then majority of the stockholders to whose interests Joseph, Murdoch and Widder have since succeeded. All of the original stockholders were directors of the corporation and apparently acquiesced in the final terms of the lease now complained of after having reviewed it, discussed it and had the opportunity for independent advice. These same stockholders, including Widder who was corporate secretary, were all directors at the time that Leonard Leeds advanced corporate funds on behalf of the partnership and made the decision to start paying rent. With the exception of Widder, none of the original shareholders have made any effort, either before or after disposing of their shares, to take action against Leeds or the partnership for his conduct while serving as president. If the equitable rule precludes suit for prior conduct as to which the vendor-shareholders either participated or acquiesced, then it would seem that the acquiescence of the previous shareholder-directors in the acts complained of should preclude suit by the present shareholders now.

Plaintiff argues that acquiescence requires knowledge, and that consequently the previous stockholder-directors could not have acquiesced in the alleged misconduct since Leonard Leeds withheld vital information from them and made the loans and the rent payment decision without their knowledge. But it seems that this very argument highlights the wisdom of Dean Pound's logic as reiterated in *Bangor Punta.* In effect it is an argument that since Leeds duped the previous stockholder-directors into acquiescence through surreptitious conduct, and thus, perpetrated a fraud upon them, the present majority stockholders, through the guise of the corporate entity, should be permitted to recover damages for themselves for wrongs committed against others. If plaintiff is correct in its theory that acquiescence was improperly obtained by Leeds, this no doubt played a large role in enabling the present shareholders to purchase substantially all the existing stock from the original shareholders for a fraction of what the latter paid for it. If they are permitted to now recover for wrongs committed to those from whom they acquired their majority interest at a deflated value, the present shareholders will reap the windfall that equity strives to preclude. By comparison to the facts of *Bangor Punta,* if the corporation is permitted to recover the more than $70,000 in damages that it now seeks for Leeds's alleged mismanagement, its three primary shareholders will have acquired for some $19,000 a corporation worth some $90,000, and thus a benefit far in excess of that which they bargained for when they undertook to acquire by far the majority ownership of a foundering corporation.

The fact that the plaintiff Widder was also a stockholder at the time of the al-

leged wrongs and merely acquired additional shares to strengthen his ownership adds an additional aspect not considered in *Bangor Punta*. However, I do not feel that this factor requires a different result under the present circumstances. In the first place he is in an ill position to complain since he was a director of the corporation as well as a partner in the defendant partnership at the time of the acts complained of. It might be argued that he stood on both sides of the questioned transactions just as did Leonard Leeds. Moreover, had he elected to bring action on behalf of the corporation and his fellow initial stockholders rather than first joining up with Joseph and Murdoch to obtain new and more complete ownership, his position might be more sympathetic. However, his decision to first realign himself with new ownership and then attempt to benefit by recovering for wrongs allegedly done to him and his previous fellow stockholder-directors deprives him, in my opinion, from any different consideration than that herein accorded to the present shareholder status of Joseph and Murdoch.

I conclude that the reasoning of *Bangor Punta* and the precedents cited therein precludes the plaintiff corporation from any recovery here even assuming that Leonard Leeds was guilty of corporate mismanagement. Having heard and considered the evidence, I am convinced that the current ownership of the corporation acquired their present investment interests with knowledge of the facts and with the intention of bringing suit. Judgment will be entered in favor of the defendants.

Order on notice.