MIDLAND FOOD SERVICES, LLC, Midland Food Services II, LLC, and Midland Food Services III, LLC, Plaintiffs,

v.

CASTLE HILL HOLDINGS V, LLC, Castle Hill Holdings VI, LLC, Castle Hill Holdings VII, LLC, Ronald F. Saverin, Key Trust Company of Ohio, NA, Janet M. Saverin, Majess, LLC, and Dajust, LLC, Defendants,

v.

Al Hut, Inc., a Delaware corporation, Counterclaim Defendant.

Civil Action No. 16779.

Court of Chancery of Delaware.

Submitted: July 8, 1999.
Decided: July 16, 1999.

David J. Ferry, Jr., Ferry & Joseph, Wilmington, DE; of counsel, Gary M. Schildhorn, Douglas N. Candeub, Adelman Lavine Gold and Levin, Philadelphia, PA, for plaintiffs.

Edward P. Welch, Randolph K. Herndon, Laura S. Clare, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, of counsel; Richard R. Kalikow, Esther S. Trakinski, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## OPINION

STRINE, Vice Chancellor.

In this action, the Midland Companies seek to recover damages and obtain other relief from their prior owner-operator, Ronald Saverin, and defendants affiliated with Saverin. The Midland Companies base all of their claims on Saverin's actions while he was their owner and operator. Because the current owner of the Midland Companies was assigned its interest from corporations that acquired their shares directly from Saverin, after his alleged wrongdoing occurred, I find that the Mid-

land Companies' claims are barred by the doctrine articulated by the United States Supreme Court in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), which this court adopted as the law of Delaware in *Courtland Manor, Inc. v. Leeds*, Del.Ch., 347 A.2d 144 (1975).

## I. *The Parties*

Plaintiffs Midland Food Services, LLC ("Midland I"), Midland Food Services II, LLC ("Midland II"), and Midland Food Services III, LLC ("Midland III") are Delaware limited liability companies ("LLCs"). Each of the Midland Companies, as I will refer to the three Midland entities, has its principal place of business in Ohio. The Midland Companies operate 125 Pizza Hut restaurants in Ohio and West Virginia under franchise agreements with Pizza Hut, Inc. Proposed Third Am. Compl. (hereinafter "Compl.") ¶ 17, 21–22.

Defendants Castle Hill Holdings V, LLC ("Castle Hill V"), Castle Hill Holdings VI, LLC ("Castle Hill VI"), and Castle Hill VII, LLC ("Castle Hill VII") are Delaware limited liability companies ("LLCs"). *Id.* ¶¶ 4–6. Each of the Castle Hill Companies, as I will refer to the three Castle Hill defendants, has its principal place of business in Missouri. *Id.* The Castle Hill Companies own many of the sites on which the Midland Companies' Pizza Huts are located and lease those sites to the Midland Companies. *Id.* ¶ 24.

The Midland Companies and Castle Hill Companies were each created by defen-

dant Ronald Saverin, a resident of Missouri. Compl. ¶¶ 23–24. Before January 1998, Saverin owned a controlling interest in and served as the principal operating officer of both the Midland and Castle Hill Companies. *Id.* ¶¶ 8, 23, 25. That month, Saverin resigned as Chief Executive Officer ("CEO") of the Midland Companies and assigned his ownership interest in the Midland Companies to certain of those Companies' creditors. *Id.* ¶ 68. Saverin retained his ownership and management of the Castle Hill Companies. *Id.* ¶ 69.

Defendants MAJESS, LLC ("MAJESS") and DAJUST, LLC ("DAJUST") are Delaware LLCs whose principal places of business are in Missouri. *Id.* ¶¶ 11–14. MAJESS and DAJUST were established to serve as trusts for the benefit of the children of Ronald Saverin. MAJESS and DAJUST are members in the Castle Hill Companies. *Id.* ¶ 14.[1]

Potential defendant CNL American Properties Fund, Inc. ("CNL") is a Maryland corporation with its principal place of business in Florida. *Id.* ¶ 15. Potential defendants APF I Properties, APF II Properties, and APF III Properties are either wholly-owned subsidiaries, divisions, or affiliates of, or are otherwise controlled by CNL. *Id.* CNL provided financing to the Castle Hill Companies to enable them to purchase several of the properties which the Castle Hill Companies in turn lease to the Midland Companies. *Id.* ¶¶ 28–38. Rather than referring to CNL and the APF entities separately, I frequently will refer solely to CNL.

1. The complaint originally named Ronald Saverin's wife, Janet M. Saverin, as a defendant. She resides in Missouri. *Id.* ¶ 10. At oral argument, plaintiffs indicated that they could not obtain personal jurisdiction over Mrs. Saverin and had no objection to a dismissal of the claims against her. The Midland Companies have also failed to allege

sufficient jurisdictional facts regarding Ronald Saverin; at oral argument, however, I agreed that the Midland Companies would have an opportunity to amend their complaint so as to rely upon 6 *Del.C.* § 18–109, under which personal jurisdiction over Ronald Saverin might be proper, if the Third Amended Complaint otherwise states a claim.

Defendant Key Trust Company of Ohio, N.A. is a banking association with its principal place of business in Ohio. *Id.* ¶ 9.

## II. *Procedural Posture of the Case*

A group of defendants[2] consisting of Saverin, his wife, MAJESS, DAJUST, and the Castle Hill Companies seek to dismiss the complaint for, among other reasons, failure to state a claim upon which relief can be granted. In addressing the defendants' Rule 12(b)(6) motion, I must initially address what complaint to consider. After the defendants filed their motion to dismiss, the Midland Companies sought leave to file a Third Amended Complaint. Although it would have been preferable had the Midland Companies taken a more focussed approach to their earlier attempts at amending their initial complaint—thus not burdening the defendants with a series of modestly evolving pleadings—it is more efficient and in keeping with Chancery Court Rule 15(a) to examine the Third Amended Complaint in deciding defendants' motion to dismiss. If the Third Amended Complaint fails to state a claim, so does the First Amended Complaint. To the extent the Third Amended Complaint fails to state a claim, I will therefore deny the motion to amend as futile, *Smith v. Smitty McGee's, Inc.*, Del.Ch., C.A. No. 15668, mem op. at 22, 1998 WL 246681, Steele, V.C., (May 8, 1998), and grant the moving defendants' motion to dismiss the First Amended Complaint. To avoid any unfairness to the defendants, I gave them the opportunity to brief the differences between the First Amended Complaint and the proposed Third Amended Complaint.[3]

In considering a motion to dismiss under Chancery Court Rule 12(b)(6), this court must assume the truth of all well-pleaded allegations, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the complaint. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213–1214 (1996). The court may dismiss the complaint if there are no facts in the pleadings from which the court could infer that the plaintiff could prevail. *In re USACafes, L.P. Litig.,* Del.Ch., 600 A.2d 43, 47 (1991).

## III. *Factual Background*

### A. *Saverin Forms The Midland and Castle Hill Companies*

In 1995, Saverin entered the pizza business by obtaining the rights to operate 125 Pizza Huts in Ohio and West Virginia.

Saverin created the various Midland and Castle Hill Companies and used them to acquire, operate, and finance these Pizza Huts. The dispute before me now turns largely on the arrangements Saverin made to finance the business. In particular, this case turns on certain leases between the Midland and Castle Hill Companies. Therefore, a brief description of the leases is in order.

According to the complaint, a typical deal between a Midland Company and a Castle Hill Company involved the following:

- Saverin would identify an existing restaurant or restaurant location.

- Saverin would then negotiate with the owner to purchase the property on behalf of a Castle Hill Company.

---

**2.** Since the other defendants are essentially nominal defendants named by the Midland Companies because they are probable indispensable parties, I simply refer to the movants as defendants. *See also* n. 6 *infra.*

**3.** Plaintiffs abandoned their Second Amended Complaint, for which leave to file was never granted.

- The Castle Hill Company would not purchase the land directly. Rather, CNL, through an APF entity, would buy and pay for the land.
- CNL would then lease the land to the Castle Hill Company at a rate sufficient to support the purchase price paid by CNL.
- The Castle Hill Company would then sublease the land to one of the Midland Companies (a "Ground Lease").
- The Castle Hill Company would receive financing from CNL to purchase or build the restaurant building. CNL would receive a note and mortgage in exchange. The Castle Hill Company would take title to the restaurant building.
- The Castle Hill Company would then lease the building to the Midland Company (a "Building Lease"). In addition to the rent required to be paid to the Midland Company under the Building Lease, the Building Lease also required the Midland Company to pay the rents due to CNL from the Castle Hill Company under the Ground Lease.

*Id.* ¶¶ 28–38. Approximately forty-five of the Pizza Hut restaurants operated by the Midland Companies were subject to Ground and Building Leases (collectively referred to as the "Leases") from the Castle Hill Companies arranged in this manner.

Simultaneous with his negotiation of these transactions, Saverin negotiated arrangements between the Midland Companies and CS First Boston Mortgage Capital ("CSFB") and other lenders to finance certain construction and enterprise costs of the Midland Companies (the "Enterprise Loans"). *Id.* ¶¶ 40–43. Pursuant to the Enterprise Loans, CSFB and other lenders hold liens on the non-real estate assets of a Midland Company. *Id.* ¶ 44. Integral, apparently, to this financing was $71,400,000 worth of financing provided by CSFB's assignee, Franchise Mortgage Acceptance Company ("FMAC"), to Midland in the form of a note (the "FMAC Senior Note").

As part of the Ground and Building Lease transactions, Saverin also obligated the Midland Companies to enter into a series of Subordination, Payment, and Security Agreements (the "Direct Pay Agreements"). *Id.* ¶ 51. The Direct Pay Agreements obligated the Midland Companies to make their Ground and Building Lease payments directly to CNL, rather than to the Castle Hill Companies.

For the further protection of the creditors of Midland I, a concentration account agreement originally dated February 1, 1996 (the "Concentration Account Agreement") was entered into between Midland I and Key Trust of Ohio. The Concentration Account Agreement was formally agreed to and accepted by, among others, CNL, CSFB, and FMAC. Pursuant to that Agreement, all revenues from Midland I are funneled into the concentration accounts, from which they are paid out by Key Trust, as trustee, to CNL and other creditors in accordance with the Agreement's terms. *Id.* ¶ 55.[4] Midland I received only what remained after the creditors were paid in accordance with the Concentration Account Agreement. *Id.*

Even though CNL was not a direct creditor of Midland I, but of the Castle Hill Companies, it received Lease payments directly from Midland I pursuant to the Direct Pay and Concentration Account Agreements. Midland I allegedly received

---

4. There are several concentration accounts. Some involve Midland I Pizza Huts not leased from Castle Hill Companies pursuant to Ground and Building leases financed by CNL. *Id.* ¶ 57.

no benefit from the transactions requiring it to make such payments. *Id.* ¶¶ 53, 59.

### B. *Saverin's Role And Alleged Self-Interest*

Saverin negotiated the transactions on behalf of both the Midland Companies and the Castle Hill Companies. This is unsurprising given that Saverin (directly or in concert with entities his family controlled) at that time allegedly owned all of the equity of the Midland and Castle Hill Companies. *Id.* ¶¶ 23–25. The Midland Companies allege that he structured the transactions to be advantageous to himself and detrimental to them. Specifically, the Midland Companies contend that Saverin: i) borrowed more money from CNL than was necessary to purchase the Grounds and Buildings; ii) retained some of the excess loan funds personally and for his family; and iii) set the Ground and Building Lease rents at rates substantially in excess of market value so as to enable the Castle Hill Companies to repay CNL and to realize "excess" profits from the rents. *Id.* ¶¶ 46–48. The rents are alleged to be commercially unreasonable and to include "annual rent increases that are fixed and not correlated to inflation, the cost of living index, or any other financial index." *Id.* ¶ 49.

### C. *The Midland Companies Flounder And The Enterprise Lenders Assume Ownership Of The Companies*

The Midland Companies allege that they quickly found themselves unable to sell enough pizzas to pay their bills and turn a profit. They further allege that part of the reason for this lack of profitability was the Ground and Building Leases, which are "between 50 and 150 percent higher than market rate." *Id.* ¶ 61.

As a consequence of failing to pay their debts, the Midland Companies fell into default with their Enterprise Lenders and Pizza Hut shortly after they began doing business. *Id.* ¶ 64. In December 1997, Pizza Hut sent Midland I a notice of default under its franchise agreement, because Midland I had failed to pay required royalties. *Id.* ¶ 65.

Saverin then commenced negotiations with Midland's primary creditors: CSFB, FMAC, and Pizza Hut. *Id.* ¶ 67. During the negotiations, Saverin told the creditors that the Midland Companies would file bankruptcy proceedings unless the creditors worked out an arrangement with him. *Id.*

■ The negotiations produced an agreement (the "Resolution Agreement") in which CSFB and FMAC received all of Saverin's equity interest in the Midland Companies and in which Saverin resigned as CEO of the Midland Companies. Under the Resolution Agreement, CSFB and FMAC had the right to assign their ownership interests to another party, subject to approval by Pizza Hut. *Id.* ¶ 68.[5]

---

5. The Midland Companies initially disputed whether I may consider the Resolution Agreement in determining this motion. They conceded that I may consider the Concentration Account Agreement and the Leases, all of which they seek to reform. Pls.' Br. at 24–25. At oral argument, they dropped their objection to my consideration of the Resolution Agreement in deciding this motion. The Midland Companies do not dispute the existence of the Resolution Agreement nor have they

pled a count challenging the enforceability of it.

The origin of the current ownership and control of the Midland Companies is integral to the Midland Companies' right to maintain this action. *Cf Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996) (court may consider documents outside of the pleadings when integral to plaintiff's claim and incorporated in the complaint). The com-

As a matter of fact told the court by the Midland Companies' counsel at a hearing, but not pled in the proposed Third Amended Complaint even though the proposed Complaint was prepared after that hearing, CSFB and FMAC assigned their ownership interests to counterclaim defendant Al Hut, LLC, a Delaware LLC. 1/14/99 Tr. at 8 (Hereinafter, "Tr. at ___"); D.U.R.E. 201; *In re Wheelabrator Technologies Inc. Shareholders Litig.*, Del.Ch., C.A. No. 11495, slip op. at 21–22, 1992 WL 212595, Jacobs, V.C. (Sept. 1, 1992) (taking judicial notice of certificate of incorporation and relying upon its clear terms in granting motion to dismiss). Al Hut is owned by Al DiMarco, a "work out" specialist with "extensive experience with troubled fast food chains." Tr. at 8.

The Resolution Agreement also contained a § 9.K, which states as follows:

*Reciprocal Releases. Ronald Saverin,* Michael Monahan, James Kerr, Christopher Flocken, Brian Rezach, *Midland Management of Ohio, LLC,* Sacor Investors II, Inc., Sacor Investors III, Inc., *Dajust, LLC* and *Majess, LLC,* and *each of Midland [I, II, and III], Pizza Hut, CSFB, and FMAC,* as servicer of the Senior Loan, *will execute a reciprocal release of claims,* other than ongoing contractual obligations (including loan documents) or, except with respect to individuals, claims for indemnity, reimbursement, exoneration, or contribution arising as a result of any claims by third parties. The release shall specifically release Ronald Saverin and Pizza Hut from their respective obligations concerning negotiations to acquire or acquisitions of any other Pizza Hut System restaurants.

(emphasis added).

The Resolution Agreement did not divest Saverin of his ownership or management positions in the Castle Hill Companies. Nor did the Resolution Agreement alter the Ground or Building Leases. Even though the Resolution Agreement modified the obligations of the Midland Companies to its creditors in certain material respects, the Resolution Agreement

---

plaint refers to that Agreement as the means by which ownership of the Midland Companies was transferred from Saverin. *See* Compl. ¶¶ 67–69. The fact that the Midland Companies chose to describe the Resolution Agreement in their complaint but not to attach it should not preclude consideration of its clear terms. To hold otherwise would be to encourage the filing of misleading complaints that strategically omit crucial information and to subject defendants to the substantial burdens of pre-trial discovery in cases that, if pled straightforwardly, can be resolved on a motion to dismiss. *See In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69 (1995) (noting that in some cases the failure to consider a document would lead to the survival of "complaints that quoted only selected and misleading portions of such documents" even though the claims pled were ultimately "doomed to failure") (citations and quotations omitted); *Ash/Ramunno Assocs., Inc. v. Branner,* Del.Ch., C.A. No. 12389, 1993 WL 193216, at *2, Hartnett, V.C. (May 21, 1993) (where plaintiff referred to contract in its complaint but did not incorporate a copy therein, defendant could introduce the contract as part of its motion to dismiss the complaint and court was not "bound to blindly accept [plaintiff's] characterization [of the contract]").

For these reasons, I will take the clear and unambiguous terms of the Resolution Agreement into account in ruling on this motion to dismiss. *Cincinnati SMSA L.P. v. Cincinnati Bell Cellular Sys. Co.,* Del.Ch., C.A. No. 15388, slip op. at 7 n. 12, Chandler, V.C. (Aug. 13, 1997) (where partnership agreement was referred to, but not actually attached to, plaintiff's complaint, court considered that agreement in ruling on a motion to dismiss), *aff'd,* Del.Supr., 708 A.2d 989 (1998); *Lewis v. Straetz,* Del.Ch., C.A. No. 7859, 1986 WL 2252, at **3–4, Hartnett, V.C. (Feb. 12, 1986) (on motion to dismiss, considering defendants' exhibits which were copies of documents referenced in plaintiff's complaint).

expressly states that "regularly scheduled rent" will be the second priority—after payments on the FMAC Senior Note—for payments from the Concentration Accounts. Resolution Agreement § 9.E.(ii). Furthermore, the Resolution Agreement obligates the Castle Hill Companies to cooperate with the Midland Companies in assigning certain of the Leases. *Id.* ¶ 9.P.

Despite the reference to certain of the Ground and Building Leases in the Concentration Account Agreement and the reference to lease payments in the Resolution Agreement, the Midland Companies plead that CSFB and FMAC only learned of the Ground and Building Leases after Al Hut took control of the Midland Companies in 1998. Compl. ¶ 71.

Later in 1998, Midland II and III stopped payment on certain of the Ground and Building Leases with regard to certain poorly-performing Pizza Hut restaurants the Midland II and III Companies closed. *Id.* ¶¶ 72–73. As a result, in August 1998, CNL and the Castle Hill Companies sent the Midland Companies default notices under the Direct Payment and Lease Agreements. *Id.* ¶¶ 77–81. As to certain of the Pizza Huts Midland I operated, Midland I has continued to pay rent, not by choice, but because the Concentration Account Agreement requires that the Midland I revenues go directly into the Concentration Accounts and be paid out in accordance with the Concentration Account Agreement. *Id.* ¶ 74.

### IV. *The Counts Of The Complaint*

On November 12, 1998, the Midland Companies filed this action. Nearly two months later, the Midland Companies moved for an expedited schedule for consideration of their motion for a preliminary injunction. After a hearing, this court denied that motion on January 14, 1999.

The complaint contains nine counts. Counts I and II allege that Saverin breached his fiduciary duties of care and loyalty by causing the Midland Companies to enter the Ground and Building Leases on commercially unreasonable terms so as to advantage the Castle Hill Companies, himself, and his family. *Id.* ¶¶ 84–93. Count III alleges that the Midland Companies were insolvent at the time they signed the Ground and Building Leases and that those Leases constituted a fraudulent conveyance to the Castle Hill Companies, CNL, MAJESS, and DAJUST. *Id.* ¶¶ 94–98. Counts IV and V allege that the Leases and the Concentration Account Agreement were not negotiated at arms-length and in good faith, and should be reformed so as to bring the payments owed by the Midland Companies under those Agreements into line with market rates. *Id.* ¶¶ 99–110. Count VI alleges that Ronald Saverin used the Castle Hill Companies to improperly benefit himself at the expense of the Midland Companies, and thus that Saverin's "veil should be pierced" to enable the plaintiffs to recover from the Castle Hill Companies. *Id.* ¶¶ 111–115.

Count VII alleges that Saverin, the Castle Hill Companies, MAJESS, and DAJUST were unjustly enriched at the expense of the Midland Companies. *Id.* ¶¶ 116–120. Count VIII alleges that Janet Saverin was unjustly enriched at the expense of the Midland Companies by a transaction in which she received $1.25 million of loan proceeds from the original Midland III financing transaction, which she then lent to Midland I in exchange for a promissory note. *Id.* ¶¶ 121–127. Count IX seeks a declaratory judgment that the Leases and the Concentration Account Agreement are voidable or reformable and thus that the failure of the Midland Companies to make full payment under those contracts does not justify the eviction no-

tices sent to the Midland Companies under those contracts. *Id.* ¶¶ 128–136.

Although the counts plead different legal theories, each is grounded on an assertion that Saverin committed a breach of his legal obligations to the Midland Companies during his tenure as their owner-operator. The Midland Companies admit as much:

> [t]he action arises out of a series of acquisition and construction financing transactions and related leases and sublease transaction undertaken by Saverin—at a time when he was the CEO ... of the three Midland Companies.... The main purpose that Saverin accomplished in structuring the leases this way was to avoid having to make any commitment of personal funds as a capital investment.... In addition, Saverin used his control position to structure side deals that benefitted his wife Janet Saverin and the two trusts set up for the benefit of their children.

*See* Pls.' Br. at 5.

■ None of the moving defendants other than Saverin are alleged to have independently wronged the Midland Companies; rather, they are being sued for the most part because Saverin was their agent and owner (e.g., the Castle Hill Companies) and/or because they allegedly benefited from Saverin's wrongdoing (e.g., MAJUSS and DAJUST).[6]

## V. *Legal Analysis: The Bangor Punta Doctrine Bars The Complaint*

The defendants argue that the Midland Companies lack standing under the doctrine articulated by the United States Supreme Court in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) and embraced by this court in *Courtland Manor, Inc. v. Leeds,* Del.Ch., 347 A.2d 144 (1975). The *Bangor Punta* Doctrine (hereinafter sometimes referred to as the "Doctrine") was well-summarized by then Vice–Chancellor Brown in *Courtland Manor* as follows:

> [A] shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the wrongful transaction. The basis for this rule is that where shareholders have purchased all or substantially all of the shares of a corporation at a fair price, they have personally sustained no injury from wrongs which occurred prior to their purchase, and consequently, any recovery on their part for such prior wrongs would constitute a windfall and would enable such shareholders to obtain funds to which they had no just title or claim. In addition, to allow recovery to subsequent shareholders for prior

---

**6.** As indicated, Key Trust and CNL are essentially nominal defendants the Midland Companies added because of their likely status as indispensable parties to certain counts. Key Trust was named in the original complaint. It has yet to answer. CNL was named in the proposed Third Amended Complaint. The Midland Companies have failed to plead facts demonstrating that this court can exercise personal jurisdiction over either of these non-Delaware entities, neither of which is alleged to have performed relevant acts in or directed at Delaware. *See Abajian v. Kennedy,* Del. Ch., C.A. No. 11425, slip op. at 24, 1992 WL 8794, Allen, C. (Jan. 17, 1992) ("It is well established law that merely contracting with an entity that is incorporated within [Delaware] does not provide [the] necessary connections ... to support a finding of jurisdiction"); *Newspan, Inc. v. Hearthstone Funding Corp.,* Del.Ch., C.A. No. 13304, at *6, 1994 WL 198721, Allen, C. (May 10, 1994) ("Plainly, I would have thought, a contract between a Delaware corporation and a nonresident ... to transact business outside Delaware, which has been negotiated without any contacts in this state, cannot alone serve as a basis for personal jurisdiction over the nonresident for actions arising out of that contract.").

wrongs would permit them to recoup a large part of the price they agreed to pay for their shares even though they had received all they had bargained for. Finally, to allow recovery would be to permit after-acquiring shareholders to profit from wrongs done to others, and thus encourage speculative litigation.

347 A.2d at 147.

*Courtland Manor* involved a situation very similar to that which exists in this case. In that case, the defendant Leeds owned and controlled a partnership, which was created to own and lease a building, as well as the plaintiff-corporation, which was formed to operate a nursing home in the building owned by the partnership. *Id.* at 145–147. After the partnership and the plaintiff-corporation executed a lease agreement for the building, the plaintiff-corporation began suffering severe cash shortages. *Id.* at 145–146. As a result, Mr. Leeds gave up his ownership interest in the plaintiff-corporation and sometime thereafter, three others purchased most of the stock of the plaintiff-corporation for "a fraction of its initial cost." *Id.* at 146. Soon after purchasing this majority interest, the three new controlling stockholders of the plaintiff-corporation caused their company to commence suit against, *inter alia,* Mr. Leeds and the partnership. *Id.* The complaint asserted that Mr. Leeds breached his fiduciary duties to the plaintiff-corporation by causing it to enter into a lease agreement that included rental terms which were "unfair" to the plaintiff-corporation and "excessively favorable" to the partnership. *Id.*

Relying on *Bangor Punta,* this court refused to permit the corporation to sue Mr. Leeds or the partnership, since most of the stockholders of the corporation at the time the suit was commenced acquired their shares after the alleged misconduct occurred. *Id.* at 147–148. Thus, the current stockholders would have obtained an unfair "windfall" if they were successful on their claims since they would be re-trading the bargain they made to become owners. *Id.* at 148.

In an important way, the *Bangor Punta* Doctrine implements the policy embodied in the continuous ownership requirement of 8 *Del.C.* § 327 and Chancery Court Rule 23.1 (and, of course, its federal counterpart). The continuous ownership requirement generally prevents a person who obtains an ownership interest in a corporation after a claim arose from suing derivatively on the claim on behalf of the corporation. *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9–2(b)(2) (1998). The *Bangor Punta* Doctrine ensures that a purchaser who obtains a controlling interest in a corporation after potential claims arose against those persons from whom the purchaser obtained his shares cannot use his control of the corporate machinery to cause the corporation to assert those claims directly.

■ The *Bangor Punta* Doctrine and the reasoning of *Courtland Manor* apply with full force in this case. Al Hut obtained its ownership interest in the Midland Companies long after the Leases—which are the basis for virtually all of the counts in the complaint—were executed.[7] Al Hut received its interest as an assignee of CSFB and FMAC, which had negotiated at arms-length to obtain that interest free

---

7. The other transaction complained of in Count VIII, the note owed to Janet Saverin, long pre-dated the Resolution Agreement and, like the Leases, is referred to therein. The Midland Companies do not dispute that the Doctrine, if applicable, bars this claim as well.

of charge from the alleged wrongdoer, Ronald Saverin, as part of the Resolution Agreement. The Resolution Agreement was executed by sophisticated parties with experience in negotiating work-out agreements.

CSFB and FMAC were on notice of the Leases because the Resolution Agreement itself reflects such knowledge and gave payments under the Leases second priority to payments on the FMAC Senior Note, Resolution Agreement ¶ 9.E.ii; *see also Id.* ¶ 2, ¶ 9.P, and because the Concentration Account Agreements discuss certain of the Leases. *See, e.g.,* May 28, 1996 Concentration Agreement at 1–3 (discussing Leases); *Id.* at 8–9 (defining Leases between Castle Hill V and VI and Midland I). In the Resolution Agreement, CSFB and FMAC specifically agreed to execute a reciprocal release absolving Saverin and the other investors in the Castle Hill Companies from liability. Resolution Agreement § 9.K.[8]

To enable this suit to go forward would sanction the type of commercial unfairness the *Bangor Punta* Doctrine exists to prevent. Al Hut acquired its interest in the Midland Companies from parties, CSFB and FMAC, which obtained their "shares from those who participated or acquiesced in the [allegedly] wrongful transaction[s]." *Courtland Manor,* 347 A.2d at 147. The *Bangor Punta* Doctrine binds Al Hut as CSFB's and FMAC's successors. *Courtland Manor,* 347 A.2d at 148. The fact that Al Hut may now wish that CSFB and FMAC struck a different deal does not entitle it to an exception to a clear rule of law which bars its claim.

The Midland Companies seek to distinguish this case from *Bangor Punta* and *Courtland Manor* on four grounds. The first is that the *Bangor Punta* Doctrine, according to them, only applies to claims "such as for breach of fiduciary duty or corporate mismanagement, whether under state or federal law, that could have been brought as shareholder derivative actions." Pls.' Br. at 11 (emphasis omitted). But the *Bangor Punta* Doctrine is not limited to barring claims for "breach of fiduciary duty or corporate mismanagement."

As a matter of logic, the nature of the claim is irrelevant to the purpose of the Doctrine, which is to prevent persons from being able to re-trade arms-length transactions by using the corporation to sue the parties from whom they obtained their shares. The fact that the claim asserted by the corporation after a change of control is one for breach of contract, rather than breach of fiduciary duty, against the person selling corporate control does not eliminate the unfairness of allowing such a claim to be asserted.

As a matter of fact, the United States Supreme Court applied the Doctrine to bar common law and statutory claims in the *Bangor Punta* case. *Bangor Punta,* 417 U.S. at 706–707, 717–718, 94 S.Ct. 2578 (dismissing all counts of plaintiff's complaint, including Maine common law claims and claims under federal and state statutes). Other federal courts have so applied the Doctrine. *See In re REA Express, Inc., Private Treble Damage Antitrust Litig.* ("REA Express"), 412

---

**8.** A matter of objective fact that the Midland Companies seek to blind me to is the fact that Al Hut's predecessors, CSFB and FMAC, actually executed such a release. *See* Defs.' Br. at Ex. B. Because the *Bangor Punta* Doctrine's application does not turn on the existence of this release, I will not consider it in ruling on this motion; nor will I determine whether it would have been appropriate to do so given the pleading strategy adopted by the Midland Companies and given the fact that the Midland Companies themselves provided me with a copy of the release at an earlier hearing.

F.Supp. 1239, 1253 (E.D.Pa.1976) (fact that claim was brought under Sherman Act did not render *Bangor Punta* Doctrine inapplicable since that doctrine "is not tied as closely to the nature of the cause of action then before the court as plaintiff would have us find"); *REA Express, Inc. v. Travelers Ins. Co. ("Travelers")*, 406 F.Supp. 1389, 1394 (D.D.C.1976) (applying Delaware law and dismissing common law claims, including claims for breach of contract, unjust enrichment, and wrongful interference with business relations, under the *Bangor Punta* Doctrine), *aff'd in part and modified in part*, 554 F.2d 1200 (D.C.Cir.), *cert. denied*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977). Likewise, in *Courtland Manor*, then Vice Chancellor Brown dismissed as barred by *Bangor Punta* a claim that one of the defendants had obtained rent payments from the corporate plaintiff in breach of a lease contract. 347 A.2d at 146–147.

■ In addition, the premise of the plaintiffs' asserted exception—that claims based on theories such as reformation[9] and unjust enrichment may not be brought derivatively—is incorrect. A derivative suit is a "suit [brought] by the corporation, asserted by the shareholders on its behalf, against those liable to it." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984). Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action. Thus, the fact that several of the counts in the Mid-land Companies' complaint do not involve corporate mismanagement or breach of fiduciary duty does not exempt those claims from the application of the *Bangor Punta* Doctrine.

■ The Midland Companies also try to distinguish *Bangor Punta* on the ground that the Resolution Agreement did not involve a "negotiated sale" of the Midland Companies to CSFB. Pls.' Br. at 13–14. Yet, the complaint alleges that CSFB obtained its ownership of the Midland Companies as a result of the Resolution Agreement. Compl. ¶¶ 67–68.[10] The fact that the Resolution Agreement was worked out between Saverin and the Midland Companies' creditors and that those creditors may have assented to the terms of the Resolution Agreement to avoid a bankruptcy filing by the Midland Companies is of no legal consequence. *Atlantis Plastics Corp. v. Sammons*, Del.Ch., C.A. No. 930, 1988 WL 32371, at *3, Hartnett, V.C. (Mar. 30, 1988) (where a creditor obtained a controlling block of shares pursuant to an agreement executed prior to sale of that stock at a sheriff's sale, the creditor-purchaser was barred from using the corporation to sue the seller for breaches of fiduciary duty occurring prior to the sale); *see also Bank of Santa Fe v. Petty*, 116 N.M. 761, 867 P.2d 431, 437 (.1993) (where noteholder foreclosed on bank shares and obtained control of bank, he could not thereafter cause the bank to sue its former directors for actions before he became a

---

9. The Midland Companies' assertion that their reformation claim is distinguishable on the ground that the count does not seek damages is not persuasive. A judicial revision of the Leases would enable the Midland Companies to reduce Lease payments expressly referred to in the Resolution Agreement and thereby rewrite the bargain Al Hut's successors freely made at Saverin's expense. The Doctrine exists to prevent just such a result.

10. The fact that the plaintiffs deleted the words "reached an agreement" (which they had used in the original complaint and the First Amended Complaint) from their Third Amended Complaint after the defendants had filed their motion to dismiss is of no moment to me since it is clear that the complaint asserts that CSFB obtained its ownership as a result of a negotiated contract—a fact that the unambiguous terms of the Resolution Agreement make indisputable.

stockholder), *cert. denied,* 117 N.M. 10, 868 P.2d 655 (N.M.1994).

To the extent that Al Hut now gets to operate the Midland Companies without paying the full rents owed under the Leases, it will be unjustly enriched at the expense of the defendants. Saverin's agreement to turn over ownership of the Midland Companies was premised on the continuation of the Leases and on a reciprocal release. Enabling CSFB's and FMAC's assignee, Al Hut, to use the Midland Companies to sue to change the Leases would vitiate the consideration Saverin received under the Resolution Agreement, resulting in precisely the type of commercial unfairness the *Bangor Punta* Doctrine exists to prevent. *Cf. Council of S. Bethany v. Sandpiper Dev. Corp., Inc.,* Del.Ch., C.A. No. 935, mem. op. at 13, 1986 WL 10081, Jacobs, V.C. (Sept. 4, 1986) (where real party-in-interest attempted to use corporation to sue on his behalf when he was barred from doing so in his individual capacity, "the corporate fiction will be disregarded and the corporation will be precluded" from asserting the claim).

■ Next, the Midland Companies contend that *Bangor Punta* does not apply because the Leases have a "continuing effect" on the Midland Companies. Although *Bangor Punta* adverted to the pos-

sibility that the Doctrine might not apply where the effects of prior wrongdoing had a "continuing effect" on the corporation, 417 U.S. at 711, n. 6, 94 S.Ct. 2578, the logic of the Doctrine and its similarity to the contemporaneous ownership rule dictate that a "continuing effect" exception should not be recognized. Where sophisticated persons assume ownership, as did CSFB and FMAC, on clear notice of the very agreements, the Leases, alleged to be the source of the "continuing effects," there is no justification for the Doctrine not to apply.

■ For that reason, courts have eschewed a "continuing effect" exception to the *Bangor Punta* Doctrine and have applied an approach similar to the "continuing wrong" exception to Rule 23.1's contemporaneous ownership rule. Under the continuing wrong exception, the key fact is when the "specific acts of alleged wrongdoing occurred, and not when their effect is felt." *Schreiber v. Bryan,* Del.Ch., 396 A.2d 512, 516 (1978). Hence, courts have refused to allow an exception to the *Bangor Punta* Doctrine in cases where plaintiffs complained that payments under contracts predating their ownership of the corporation constituted a "continuing wrong" to the corporation.[11]

■ Finally, the Midland Companies claim that the Doctrine does not apply because they are, in reality, asserting their

---

11. *See, e.g., Bank of Santa Fe,* 867 P.2d at 435–436 (In an opinion applying the Doctrine, holding that leases requiring continuing payments which predated plaintiff's ownership of the corporation do not produce "the type of continuing harm that justifies not applying the contemporaneous ownership doctrine."); *REA Express,* 412 F.Supp. at 1253–1254 (new owners must be deemed to have been aware of disadvantageous pre-ownership agreements producing post-ownership damages before they assumed ownership of the corporation, thus the Doctrine barred suit by the corporation for damages resulting from those agreements); *Travelers,* 406 F.Supp. at

1394–1395 (where life insurance contract pre-existing plaintiffs' ownership of corporation required ongoing payments of premiums, the corporation could not sue since the new owners were deemed to have knowledge of the contract terms and the terms of the contract "should have been reflected in a lower purchase price"); *see also Bird v. Lida, Inc.,* Del.Ch., 681 A.2d 399, 406 (1996) (where leases requiring continuing payments allegedly at above market rates predated ownership of derivative plaintiffs, the continuous ownership requirement barred their claim and the continuing wrong exception was inapplicable).

claims not for the benefit of themselves or Al Hut, but for the benefit of the creditors of the Midland Companies. This rather odd assertion does not avail the Midland Companies. For one thing, I have no reason to believe that the Midland Companies or Al Hut are anything other than profit-maximizing corporations. To the extent that they can reduce the rents due under the Leases, Al Hut increases its chances to turn around the Midland Companies' performance. Although this will have the instrumental effect of helping those Companies pay their creditors, the ultimate end sought is not health for the creditors; it is profits for the Midland Companies and their sole owner, Al Hut. Affording Al Hut this competitive advantage at the expense of the defendants results in the inequity the Doctrine is designed to prevent.

Such is also the case even if Al Hut is genuinely trying to advance the interest of the Midland Companies' creditors.[12] The Midland Companies assert that the "principal creditors" of the Midland Companies are CSFB, FMAC, and Pizza Hut. Pls.' Br. at 14. Each of these creditors is a party to the Resolution Agreement. That Agreement incorporated provisions acknowledging the existence of the Leases and a provision in which CSFB, FMAC, among others, agreed to release any claims they had against Saverin, DAJUST, MAJESS, and the other owners of the Castle Hill Companies. It would therefore be inconsistent with the Doctrine to allow CSFB's and FMAC's assignee under that Agreement, Al Hut, to recover on these

creditors' behalf through a suit nominally brought by the Midland Companies. *See Bangor Punta*, 417 U.S. at 715, 94 S.Ct. 2578 (rejecting argument that plaintiff-corporation should be entitled to recovery since any recovery would benefit the public where the plaintiff-corporation "would be entitled to distribute the recovery in any lawful manner it may choose"); *REA Express*, 406 F.Supp. at 1395 (rejecting argument that *Bangor Punta* Doctrine should not bar a claim because the plaintiff-corporation had filed for bankruptcy and therefore any recovery would benefit creditors); *cf. Council of S. Bethany*, Del.Ch., mem. op. at 13, 1986 WL 10081.

In concluding that the *Bangor Punta* Doctrine bars plaintiffs' complaint, I am not insensitive to the surface appearance of unfairness that results from the application of the Doctrine. I mean, can't it be said that the Doctrine insulates wrong-doers from liability? When the question is closely considered, I think not. After all, the *Bangor Punta* Doctrine does not prevent a party who obtained control of a corporation from a seller from asserting a claim that the sales agreement should be rescinded because the seller defrauded or otherwise wrongfully induced the purchaser to execute the agreement. Al Hut's predecessors, CSFB and FMAC, and Al Hut, as their successor, certainly had that option if they believed that the defendants had misled or coerced CSFB and FMAC into signing the Resolution Agreement.[13]

What the *Bangor Punta* Doctrine does prohibit is purchasers like CSFB, FMAC,

---

12. This puts aside the problem that this assertion creates a problem for the Midland Companies under Rule 17(a) of this court, which requires that a complaint be brought on behalf of the real party in interest. If it is true that the Midland Companies are seeking relief solely for the benefit of CSFB, FMAC, Pizza Hut, and other Midland Companies' creditors, then this action should be dismissed on the independent ground that plaintiffs are not the

real parties in interest. *See Cammile v. Sanderson*, Del.Super., 101 A.2d 316, 318–319 (1953); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1543 (1990) ("The action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right.").

13. It is telling that the Midland Companies belatedly suggest that the Resolution Agree-

and Al Hut from accepting their end of the bargain—ownership and control of the corporation—and attempting to sweeten their end of the deal by suing the seller to recover damages to the corporation allegedly caused by the seller before the sale. The *Bangor Punta* Doctrine properly prohibits as inequitable such attempts at retrading commercial transactions through litigation.

The moving defendants advance several other arguments as to why the complaint should be dismissed. Although many of them are meritorious and would justify dismissal of several of the counts in the complaint,[14] I need not address them since the *Bangor Punta* Doctrine bars the counts in the Complaint in their entirety.

### V. *Conclusion*

For the foregoing reasons, I hereby grant the moving defendants' motion to dismiss and deny plaintiffs' motion to amend. Defendants shall, upon notice as to form, submit a conforming order.

---

ment was "tainted by nondisclosures of material information concerning the leases," Pls.' Br. at 18, but have not sought rescission of that Agreement in their *Third Amended Complaint* despite having pled nine other counts. I refuse to blind myself to the fact that the clear terms of the Resolution and Concentration Account Agreements at the very least put the sophisticated predecessors of Al Hut on inquiry notice of the actual terms of the Leases and to allow the procession of this lawsuit.

14. Three examples of this follow. First, the Midland Companies—who are not creditors of themselves and who are in fact the alleged fraudulent transferors—have no right to bring a fraudulent conveyance claim. *See* 6 *Del.C.* § 1307; *John Julian Constr. Co. v. Monarch Builders, Inc.,* Del.Super., 306 A.2d 29, 35 (1973), *aff'd,* Del.Supr., 324 A.2d 208 (1974). Second, the allegation that Saverin could breach fiduciary duties owed to companies he wholly owned seems at odds with prior Delaware case law. *Goodman v. Futrovsky,* Del. Supr., 213 A.2d 899, 902 (1965) (defendants could not defraud company since they "were the sole owners ... and could do with it as they wished"), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1197, 16 L.Ed.2d 209 (1966). Third, the Midland Companies have not pled an oral meeting of the minds and the type of scrivener's fraud or mistake upon which a reformation claim must be grounded. *Waggoner v. Laster,* Del.Supr., 581 A.2d 1127, 1135 (1990); *Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc.,* Del.Ch., 280 A.2d 745, 748 (1971), *aff'd,* Del.Supr., 291 A.2d 276 (1972). Numerous other problems exist with respect to the claims in the complaint, but I need not burden the reader with a description of them.