**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE: DYNAMK FUND ADVISORS LLC, a Delaware limited liability company, and DYNAMK CAPITAL LLC, a Delaware limited liability company. | C.A. No. 2026-0002-JTL |

**OPINION GRANTING MOTION TO DISMISS**

Date Submitted: February 11, 2026
Date Decided: May 20, 2026

John M. Seaman, Eliezer Y. Feinstein, Madison Barnes, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Petitioner Mario M. Kranjac.*

J. Peter Shindel, Jr., FOX ROTHSCHILD LLP, Wilmington, Delaware; *Attorneys for Respondents Dynamk Fund Advisors LLC and Dynamk Capital LLC.*

**LASTER, V.C.**

Two siblings are the co-managers of a manager-managed limited liability company (the "Company").[1] One sibling—the brother—filed this action seeking an order dissolving the Company. He claims that he and his sister are deadlocked at the manager level, making it impracticable for the Company to carry on its business in conformity with its LLC agreement. He invokes Section 18-802 of the Delaware Limited Liability Company Act (the "LLC Act"), which authorizes dissolution under those circumstances.

The Company contends that under its LLC agreement, the brother cannot pursue any litigation involving the Company unless he first obtains approval from a majority of the Company's members (the "Antisuit Provision"). Because the brother has not obtained majority-member approval for this lawsuit, the Company maintains that the case must be dismissed.

The Antisuit Provision appears in Article VI of the Company's LLC agreement. The first section of that article addresses the managers' authority. That section contains two subsections.

The first subsection authorizes the managers to divide responsibility for running the business among themselves, but requires member consent for any non-day-to-day decisions. By default, the LLC Act contemplates that the holders of a

---

[1] There are actually two LLCs. Their governing agreements are substantively identical, but their member-level ownership differs. For simplicity, this decision focuses on the Company and its LLC agreement in the above-the-line text and addresses the other LLC in footnotes. At every level, the analysis is more straight-forward for the other LLC.

majority of the member interests can take action, so the first section establishes a general requirement of majority-member approval for non-ordinary-course acts.

The second subsection identifies four items that cannot be taken without "Majority Approval of the Members." The LLC agreement defines "Majority Approval" consistent with the LLC Act's default rule.

One of the four items is commencing any litigation involving the Company. The requirement to obtain Majority Approval before commencing litigation manifests as the Antisuit Provision.

The two subsections work together to implement a familiar conceptual structure. The first subsection establishes a general rule. The second subsection identifies four specific items that the drafters wanted to make sure everyone understood fell within the general rule.

Under this structure, the Antisuit Provision addresses the ability of a manager to cause the Company to take action (the "Manager-Authority Reading"). The Antisuit Provision does not address the ability of a member to assert its rights as a member, whether those rights arise under the LLC agreement, the LLC Act, or other sources of law. It also does not cover derivative claims, because those are claims brought by members that fall outside the scope of the limitation on managerial authority.

The sister, however, reads the Antisuit Provision broadly as providing that no one—including a member—can bring any claim involving the Company without Majority Approval (the "Every-Claim Reading"). She concludes that her brother

2

cannot pursue this litigation because a claim for dissolution involves the Company, and he did not obtain majority approval before filing suit.

The Company currently has three members, each owning a minority member interest. If the Every-Claim Reading is correct, then none of the members can assert their statutory, contract, and common law rights unless at least one of the other members consents.[2] Under the Every-Claim Reading, the Antisuit Provision functions as an all-encompassing covenant not to sue, except where the majority agrees. Delaware law approaches covenants not to sue with skepticism, making that reading dubious.[3] Presumably the implied covenant of good faith and fair dealing would constrain the other members' discretionary right to block suit to some degree,[4] but the implied covenant's role is limited, and over the past two decades, the Delaware Supreme Court has consistently rejected its application.[5] Introducing the

---

[2] The situation is worse at the other LLC. Although initially the second LLC had other members in addition to the siblings, the sister currently controls a majority of the member interests. If the Every-Claim Reading is correct, then she becomes the judge in her own case, because she can single-handedly foreclose majority approval, rendering the brother's member-level rights illusory.

[3] *See generally New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520 (Del. Ch. 2023).

[4] *See Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118–19 (Del. 2022).

[5] *See, e.g.*, *Johnson & Johnson Fortis Advisors LLC*, 352 A.3d 229, 259–60 (Del. 2026) (reversing post-trial decision awarding relief for breach of the implied covenant); *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920–91 (Del. 2021) (same); *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507–08 (Del. 2019) (same); *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808,

implied covenant as an overlay would be cumbersome and introduce substantial uncertainty as to the members' ability to enforce their member-level rights. In substance, a member would have to sue to find out if the member could sue.[6]

For derivative claims, the Every-Claim Reading conflicts with the provision in the LLC Act that governs when a member can sue on an LLC's behalf. The language of that provision does not contain the words "unless otherwise provided in the limited liability company agreement," a phrase otherwise strewn across the LLC Act.[7] Its absence suggests that the statutory provision governing derivative actions is mandatory such that an LLC agreement cannot override it. If so, then the Every-Claim Reading conflicts with a mandatory statutory term.[8]

---

815–16 (Del. 2013) (affirming pleading-stage dismissal of implied covenant claim); *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (same).

[6] As odd as that might sound, it is what the demand regime requires for derivative actions. The difference is that the Every-Claim Reading imposes a far more constraining gateway requirement that lacks the escape hatches of demand futility or wrongful refusal.

[7] *See* 6 *Del. C.* § 18-1001 ("A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.").

[8] I acknowledge that when interpreting the LLC Act's section on statutory dissolution, this court held that the absence of the oft-appearing phrase did not signal a mandatory term and that an LLC agreement could waive the right to judicial dissolution. *See R & R Cap., LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *5–6 (Del. Ch. Aug. 19, 2008). In my view, *Doe Run* was wrongly decided. The absence of the otherwise nigh-ubiquitous "unless otherwise provided in the limited liability company agreement" strongly signals a mandatory term. To reach the contrary result, *Doe Run* treated LLCs as purely contractual entities, which

4

For claims for breach of fiduciary duty, whether derivative or direct, the problem grows even worse. The Every-Claim Reading operates as discretionary immunity that the majority can deploy as it wishes.[9] Although the LLC Act authorizes LLC agreements to eliminate fiduciary duties (and many do), the LLC

---

overstates the case. *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605–06 (Del. Ch. 2015) (explaining why an LLC is not a purely contractual entity); *accord Obeid v. Hogan*, 2016 WL 3356851, at *5 n.2 (Del. Ch. June 10, 2016) (explaining that LLCs are primarily contractual, not purely contractual); *see In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract . . . ."). More broadly, the ability to dissolve an entity is a core function of the chartering state, comparable to the chartering state's power to bring an entity into existence. Dissolution is so closely linked to the power of the chartering state that this court has declined to consider dissolving an entity chartered by another state. *In re Coinmint, LLC*, 261 A.3d 867, 907–08 (Del. Ch. 2021); *see generally* Peter B. Ladig & Kyle Evans Gay, *Judicial Dissolution: Are the Courts of the State that Brought You In the Only Courts that Can Take You Out?*, 70 Bus. Law. 1059 (2015) (arguing that the chartering state's courts have exclusive jurisdiction over dissolution). It does not seem to me that private parties should be able to deprive the chartering state of such an important function. There is also the risk that a non-dissolvable LLC will devolve into "some alternative entity version of Sartre's Huis Clos." *Huatuco v. Satellite Healthcare*, 2013 WL 6460898, at *1 n.2 (Del. Ch. Dec. 9, 2013), *aff'd,* 93 A.3d 654 (Del. 2014) (TABLE). That risk in turn has led this court to assert its traditional equitable power of dissolution. *See Carlisle*, 114 A.3d at 605. That equitable work-around would not be necessary if the statutory dissolution provision were non-waivable. Other jurisdictions have made what I regard as a more prudent choice. The Revised Uniform Limited Liability Company Act does not permit an LLC agreement to divest the courts of the chartering state of their statutory authority over dissolution. Rev. Unif. Ltd. Liab. Co. Act § 105(c)(9) (Unif. L. Comm'n 2006). New York does not either. *See Youngwall v. Youngwall Realty, LLC*, Index No. 22266/07 (N.Y. Sup. Ct. July 28, 2008) (citing *Matter of Dissolution of Validation Rev. Assocs., Inc.*, 646 N.Y.S.2d 149 (App. Div. 1996), *rev'd on other grounds*, 690 N.E.2d 487 (N.Y. 1997)).

[9] In the second LLC, where the sister controls a majority of the member interests, she can withhold majority approval as a form of *de facto* immunity (subject to the implied covenant of good faith and fair dealing).

agreement in this case does not.[10] The LLC agreement also preserves liability for fraud, gross negligence, intentional misconduct, and any breach of their fiduciary duty.[11] Yet the Every-Claim Reading would turn the preservation of those remedies into half-measures, because a member only could enforce them if a majority interest signed off.[12]

If I were ruling on a clean slate, I would reject the Every-Claim Reading, apply the Manager-Authority Reading, and hold that the Antisuit Provision does not apply to this case because the brother is suing for dissolution as a member. But the situation is more complicated. The siblings previously engaged in an arbitration that produced a detailed award. A New York court has confirmed the award as a judgment. Both the award and judgment repeat the language of the Antisuit Provision and declare that it constrains the brother.

The judgment has issue-preclusive effect, so this court is bound by it.

---

[10] *See* Dkt. 1, Ex. A, § 6.06(A). The second LLC's governing agreement has the same structure. *See* Dkt. 1, Ex. B, § 6.06(A).

[11] Dkt. 1, Ex. A, § 6.06(A). The second LLC's governing agreement has the same structure. Dkt. 1, Ex. B, § 6.06(A).

[12] For the second LLC, the problem is particularly stark. Because the sister owns a majority member interest, the Every-Claim Reading nullifies the liability-preserving provision, because the sister decides whether a claim could be filed. Indeed, under the Every-Claim Reading, a member could not sue without the sister's consent even if the sister had committed a clear breach of the duty of loyalty, such as embezzling the second LLC's funds. There is some irony to that example, because an arbitrator has found that the brother—not the sister—embezzled company funds. Dkt. 11, Ex. B (the "Award"), ¶ 169.

Unfortunately, it is not entirely clear what the judgment means.

Neither the award nor the judgment spends much time analyzing the Antisuit Provision. Both treat its meaning as self-evident. Both therefore repeat its language in a matter-of-fact way that provides some support for the Every-Claim Reading. Three aspects of the award, however, provide insight into how the arbitrator understood the Antisuit Provision.

First, the arbitrator applied the Antisuit Provision to dismiss the brother's derivative claims. The arbitrator also noted that the Antisuit Provision would apply to the derivative claims that the sister and another member filed, but they held a majority of the member interests and therefore could provide Majority Approval.[13] Those rulings indicate that the arbitrator viewed the Antisuit Provision as applying to any company claim, including derivative claims (the "Company-Claim Reading").

Second, the award recognizes that the brother can enforce his contractual information rights under the LLC agreement. That suggests that the arbitrator did not view the Antisuit Provision as applying to the brother's ability to assert direct claims or personal claims, including attempts to enforce rights he possessed under the LLC agreement. An attempt to enforce an information right is a claim "involving the Company," so that outcome disconfirms the Every-Claim Reading. That outcome makes sense under the Company-Claim Reading, because a member's attempt to

---

[13] For the second LLC, the sister held a majority of the member interests and hence could authorize any derivative claims herself.

enforce one of its rights under the LLC agreement is a direct claim belonging to the member, not a claim belonging to the Company.

Third, the arbitrator did not reference the Antisuit Provision when addressing the sister's claim for breach of the implied covenant of good faith and fair dealing inherent in the LLC agreement. The arbitrator also did not reference the Antisuit Provision when addressing the sister's claim for defamation based on her brother's criticisms of her actions involving the Company. Both were claims "involving the Company," so those outcomes again disconfirm the Every-Claim Reading. They are again consistent with the Company-Claim Reading because neither a claim for defamation nor a member's attempt to enforce a right under the LLC agreement constitute company claims.

There is no indication that the arbitrator considered, much less endorsed, the Manager-Authority Reading. At no point did the arbitrator distinguish between (i) a manager's ability to cause the Company to sue or to assert claims on behalf of or involving the Company and (ii) a member's ability to sue derivatively or assert claims involving the Company.

Although I would not have adopted the Company-Claim Reading independently, under principles of issue preclusion, that reading is binding. Applied to this case, the Company-Claim Reading means that the Antisuit Provision does not prevent the brother from seeking dissolution. As a member, the brother has the right to sue for dissolution under the LLC Act. That is a direct cause of action that the brother can assert in his capacity as a member. Conceptually, it is no different than

8

the brother's right to seek books and records under the LLC agreement as a member, which the arbitrator acknowledged the brother could pursue.

But that does not mean the brother has stated a claim on which relief can be granted. The arbitrator also interpreted the scope of the provisions governing managerial authority and held, effectively, that the brother has none. Under principles of issue preclusion, that reading is binding.

Because the brother effectively has no managerial authority, there is no deadlock. This is not a situation where deadlock exists at the manager level that enables a CEO to continue to operate free of governing-body oversight. Under the award and judgment, the sister has managerial authority. It is not reasonably conceivable that a deadlock exists. Nor is it reasonably conceivable that it is impracticable to carry on the Company's business.

The motion to dismiss is granted.

## I.     FACTUAL BACKGROUND

The facts come from the petition, the documents it incorporates by reference, supplemental letters provided by the parties, and factual findings from the award that binds the parties under principles of issue preclusion (the "Award").[14]

## A.     The Companies And Their Governance Structure

In 2015, the brother-sister team of Mario and Daniella Kranjac launched a

---

[14] The supplemental letters addressed the member interest structure of the two LLCs. *See* Dkts. 21–22. The petition had not accurately described the member interest structure of the Company.

venture capital firm that would manage investment funds focused on early-stage life sciences companies.[15] Daniella was a biochemical engineer with 25 years' experience in the life sciences industry. Mario was a corporate lawyer who had founded and ran a law firm.

The venture capital firm operated through Dynamk Fund Advisors LLC, which this decision calls the Company. Mario drafted its governing agreement (the "LLC Agreement").[16] The Company initially had multiple members. During the events relevant to this litigation, its members were Mario, Daniella, and Reinhard Vogt, another veteran of the life sciences industry. Each held a minority position.[17]

Article VI of the LLC Agreement is titled "Company Management." Section 6.01 is titled "Management by Managers." It has two subsections.

The first subsection establishes a manager-managed structure, names Daniella and Mario's affiliates as managers, and addresses the scope of their authority in general terms (the "General-Authority Provision"). It states:

> The day-to-day management and operations of the Company shall be conducted by the following managers: DK Member and MK Member

---

[15] This decision refers to the siblings by their first names, without suggesting familiarity or intending disrespect.

[16] Dkt. 1, Ex. A.

[17] Mario and Daniella also formed Dynamk Capital LLC ("Capital") to serve as the investment manager for the funds they planned to form. Capital's LLC agreement is substantively identical to the Company's LLC agreement. *See* Dkt. 1, Ex. B. Initially Capital's members consisted of Mario, Daniella, and a few others. During the events relevant to this litigation, Mario and Daniella were its only members. Daniella held a majority of the member interests with Mario owning the rest.

10

(hereinafter referred to as the "Managers"). The Managers shall divide responsibilities among themselves; provided, however, that any material or non-day-to-day decisions shall require Member consent. Subject to and limited by the provisions of this Agreement, the Managers . . . shall have the authority, discretion, obligation and responsibility to manage and control the affairs of the Company to the best of their ability . . . and . . . shall appoint and oversee the officers of the Company and shall make all decisions and take all actions with respect thereto.[18]

Rather than bringing Mario and Daniella's affiliates into the mix, this decision continues to refer to them individually.

The General-Authority Provision could have been clearer in its allocation of authority. It plainly establishes a multi-manager structure, and that type of structure typically seeks to mirror the governance structure of a corporation. In a corporation, there are generally three levels of authority. First, there are day-to-day issues, which officers and employees principally handle. Next, there are board-level issues, consisting of more significant business issues and questions of policy that the board of directors must address. Finally, there are major issues that can require stockholder approval. Under the Delaware General Corporation Law (the "DGCL"), the issues in the last category are few, and they require an initial board recommendation followed by stockholder approval.[19] But corporations often construct governance structures that give stockholders approval rights over a range of actions. Historically, those

---

[18] LLC Agreement § 6.01(A).

[19] *See, e.g.*, 8 *Del. C.* §§ 242, 251, 271, 275.

11

rights had to appear in the charter,[20] although some issues (like super-majority voting standards or quorum requirements) could appear in the bylaws.[21] Today, approval rights can appear in governance agreements.[22]

Some aspects of the General-Authority Provision reflect a three-level structure. The reference to the managers appointing and overseeing officers suggests that officers would handle the day-to-day issues. The presence of multiple managers suggests a board that would handle board-level issues. So does language empowering the managers with "the authority, discretion, obligation and responsibility to manage and control the affairs of the Company to the best of their ability," which resembles the DGCL's familiar and foundational statement that "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[23] And the requirement of majority-member approval suggests there are some issues that would correspond to stockholder-level issues.

But the most specific language in the General-Authority Provision contemplates a two-level structure, not a three-level structure. It states that "[t]he

[20] *See, e.g., id.* §§ 102(a)(4), 102(b)(1), 141(a), 151, 212(a).

[21] *See, e.g., id.* §§ 109, 216.

[22] *See id.* § 122(18).

[23] *Compare* LLC Agreement § 6.01(A) *with* 8 *Del. C.* § 141(a).

day-to-day management and operations of the Company shall be conducted" by the managers, then states that "any material or non-day-to-day decisions shall require Member consent."[24] That language distinguishes between (i) day-to-day issues, which managers can handle and inferably empower officers to address, and (2) material or non-day-to-day decisions that require member consent. The stronger reading is therefore that the General-Authority Provision establishes a two-level structure, although the provision is arguably ambiguous. As we will see, the arbitrator interpreted the provision as establishing a two-level structure, and that interpretation is binding.

The General-Authority Provision is only the first of two subsections in Section 6.01. The second subsection identifies a list of specific items that require majority-member approval (the "Specific-Item Provision"). It states:

> Majority Approval of the Members shall be required prior to any non-waivable provisions of the Act [sic], or: (i) amendment, modification, termination or waiver of rights under this Agreement; (ii) executing a recourse or a confessed judgment promissory note or otherwise confessing a judgement against the Company in connection with any threatened or pending legal action; (iii) admitting any other person as a Member; or (iv) commencement of any litigation or arbitration proceedings involving the Company and settlement of any such proceedings.[25]

Item (iv) is the Antisuit Provision.

The Specific-Item Provision is not a model of clarity, as demonstrated by its

---

[24] LLC Agreement § 6.01(A).

[25] *Id.* § 6.01(B).

13

garbled lead-in about "non-waivable provisions of the Act." As significant, the Specific-Item Provision speaks in the passive voice. It starts with the statement "Majority Approval of the Members shall be required prior to" a list of actions. It does not identify a subject who will be doing the acting.

Although the Specific-Item Provision lacks an explicit subject, its placement in the LLC Agreement and relationship to the General-Authority Provision speaks powerfully to whom the provision addresses. Recall that Article VI of the LLC Agreement is titled "Company Management," and that Section 6.01 is titled "Management by Managers." Section 6.01(A)—the General-Authority Provision— speaks generally to the managers' authority and requires majority-member approval for actions that go beyond day-to-day decisions. The Specific-Item Provision follows immediately and identifies specific items that require majority-member approval. The Specific-Item Provision thus logically addresses manager authority. It identifies specific items that the drafters wanted everyone to understand would require majority-member approval before a manager could take them.

The relationship between the General-Authority Provision and the Specific-Item Provision might not be so clear if the Specific-Item Provision used a different standard for majority approval. The Specific-Item Provision starts with the phrase "Majority Approval of the Members shall be required." That language differs from the statement in the General-Authority Provision that "any material or non-day-to-day decisions shall require Member consent."

But is there any difference? The LLC Agreement defines Majority Approval as

14

"[t]he affirmative vote of Members owning greater than fifty percent (50%) of the Percentage Interests."[26] The LLC Agreement defines "Percentage of Membership Interest" as "the percentage in the Company" held by the member.[27] Majority Approval thus means approval by members holding more than 50% of the member interest.

What does member consent mean? It means consent from the members. By default under the LLC Act, the affirmative vote of members holding a majority of the member interests is controlling.[28] The LLC Agreement does not define member consent to mean anything else.

Member consent under the General-Authority Provision thus means the same thing as Majority Approval under the Specific-Item Provision. Both require approval from holders of a majority of the member interests (the "Majority-Approval Requirement") before a manager can take action that is material or not part of the Company's day-to-day business. The General-Authority Provision establishes that general rule. The Specific-Item Provision makes clear that four specific items (about which there otherwise might be debate) fall within the general rule.[29]

---

[26] *Id.* § 2.01.

[27] *Id.* Technically it refers to the percentage "shown opposite the name of such Member on <u>Exhibit "A"</u> attached hereto, as the same may be adjusted from time to time." *Id.*

[28] 6 *Del. C.* § 18-402.

[29] The Award reaches the same conclusion by making a factual finding. After noting that the General-Authority Provision refers to member consent, the Award

15

## B.     The Actual Division Of Work

Although the General-Authority Provision nominally made both Daniella and Mario managers, Daniella always handled the Company's management. Mario performed legal work as needed. When doing so, Mario did not act as a manager or even as an in-house general counsel. He treated the Company as any other client of his firm and billed the Company for his time.

In 2016, the Company formed its first investment fund: Dynamk Life Sciences Fund, L.P. (the "Original Fund"). Daniella and Vogt raised most of the capital. The investors became limited partners in the Original Fund. The Company serves as the general partner of the Original Fund.[30]

## C.     The Disputes

After the Company formed the Original Fund, the siblings' relationship grew strained. Mario's law firm had drafted the Original Fund's limited partnership agreement and private placement memorandum, but when negotiating with a global pharmaceutical company over a potential capital commitment, the pharmaceutical

---

states: "While there was no direct testimony offered at the Hearing as to whether 'Member consent' required that such consent be by Majority Approval or unanimous, the common understanding of the Parties appears to be that Majority Approval is sufficient for 'Member consent' to material or non-day-to-day decisions." Award ¶ 138. In a footnote, the Award states: "That the parties expressly provided for unanimous consent elsewhere in the 2020 LLC Agreements (*e.g.*, Section 10.01) shows that had the Parties intended to require unanimous consent of the Members for any material or non-day-to-day decisions, they knew how, and chose not, to do so." *Id.* ¶ 138 n.60.

[30] Capital acted as the Original Fund's investment manager.

company raised questions about the documents. The Company had to retain Morgan, Lewis & Bockius to revise the documents. Mario insisted on supervising Morgan Lewis, and he billed the Company an amount nearly equal to Morgan Lewis's bill. Not only that, but it was his firm's drafting that had caused the problems in the first place. Daniella concluded that Mario had charged the Company excessive fees for poor quality work.

Starting in 2016, Mario took on another significant additional commitment by serving as mayor of Englewood Cliffs, New Jersey. Controversies surrounded his tenure, and investors in the Original Fund expressed concern about adverse publicity.

In 2020, Mario apologized to the Dynamk team and promised to step back from politics. But he continued his political activities. He also continued to generate controversy, including referrals to the New Jersey State Bar for disciplinary action and to the New Jersey Attorney General for potential prosecution relating to a public records dispute. The Company became embroiled in that dispute and was forced to spend over $50,000 on legal fees because Mario had conducted government business using his Dynamk email address.

Mario also became adversarial and defensive toward Daniella, the Company's employees, and their contractors and consultants. Daniella asked Mario to limit his communications with Company personnel, but Mario refused. In an effort to address the problem, Daniella set up an outbound-email screening tool for Mario's account.

D. **Daniella Founds Avant Bio.**

By 2021, the Original Fund had completed its investment period and was no

longer evaluating new investments. The Company shifted its focus toward managing and monetizing the Original Fund's investments with the goal of distributing capital to its limited partners.

With the Original Fund entering a new phase, Daniella and Mario discussed forming a successor fund. They could not agree on a governance structure or an economic split, so the concept was abandoned.

In 2022, Daniella told Mario that if they could not agree on a successor fund, she would strike out on her own. In May 2023, Daniella formed her own venture capital firm that would operate under the name Avant Bio. It too would focus on life sciences, tech-bio, and health tech investments. Because the Company was not making new investments through the Original Fund, Daniella did not see any conflict between Avant Bio and the Company.

Daniella asked some of the Company's personnel to work for Avant Bio as employees or consultants. No one used the Company's confidential information or assets.

E.     **The Award**

In November 2023, Mario filed an arbitration against Daniella, Avant Bio, Vogt, and members of the Dynamk team. Mario demanded arbitration both in his own name and derivatively on behalf of the Company. The demand asserted claims for breach of contract, breach of fiduciary duty, shareholder oppression, *ultra vires* acts, indemnification, civil conspiracy, contractual fraud, fraudulent inducement,

18

libel and defamation, and conversion.[31]

In response, Daniella, Vogt, and their co-defendants asserted nine counterclaims against Mario. The claims included breach of contract, breach of fiduciary duty, indemnification, defamation, conversion, fraud, and tortious interference with business relations. Unlike Mario, the defendants only asserted claims in their own names; they did not assert claims on behalf of the Company.

The parties conducted extensive discovery, and the arbitrator presided over a three-day evidentiary hearing. The parties submitted post-hearing briefs and responses to the arbitrator's questions. On August 8, 2025, the arbitrator issued a 99-page ruling in the form of the Award.

The Award rejected all of Mario's claims. The Award also rejected most of the counterclaims, but granted relief on the counterclaims for defamation and indemnification.

The Award included a series of declarations and factual findings addressing disputes under the LLC Agreement. Those rulings included:

- Mario and Daniella never agreed to divide their managerial responsibilities equally.[32]

---

[31] Mario asserted parallel claims involving both the Company and Capital. To make matters simpler, the above-the-line text continues to discuss only the Company. The arbitrator issued identical rulings involving Capital.

[32] Award ¶ 163.

- Mario never assumed any responsibilities beyond his general counsel role and did not undertake additional duties beyond his legal work and attending meetings with certain investors.[33]

- Mario was not entitled to an order granting him "equal management rights per the Operating Agreement."[34]

- Mario "has no unilateral authority to make any management determinations or decisions . . . on behalf of, or regarding [the Company] . . . without Majority Approval."[35]

Those rulings fundamentally altered the managerial structure of the Company. Instead of acting as co-equal managers, Daniella effectively became sole manager.

The Award also made several rulings involving the Antisuit Provision. The first ruling held that Mario breached the Antisuit Provision by asserting derivative claims without first obtaining Majority Approval:

> Mr. Kranjac breached [the Antisuit Provision] by commencing this arbitration, individually and on behalf of [the Company] without the Majority Approval of the Members . . . , which forced [the Company] to incur expense in defending against Mr. Kranjac's derivative claims. Mr. Kranjac's breach of [the Antisuit Provision] was willful and knowing inasmuch as the 2020 LLC Agreements were prepared by him or under his supervision and was taken in violation of the prohibition on a Member/Manager from [sic] "perform[ing] . . . (iv) any act without any consent or ratification which is required to be consented to or ratified by the Members pursuant to any provisions of this Agreement."[36]

---

[33] *Id.*

[34] *Id.* ¶¶ 166–167.

[35] *Id.* ¶ 172; *accord id.* at 97, Declaration #5.

[36] *Id.* ¶ 297 (citations omitted). The quoted language about a "Member/Manager" performing an act requiring consent appears in Section 6.03 of the LLC Agreement, titled "Limitations on Authority." It states: "No Member/Manager shall have any authority to perform (i) any act in violation of any applicable law or regulation thereunder, (ii) any act in contravention of this

20

This passage thus focused on derivative claims brought on behalf of the Company, consistent with the Company-Claim Reading.

The Award next applied the same reasoning to the breach of contract and conversion claims that Daniella and Vogt had asserted. The Award first rejected the proposition that Daniella and Vogt could assert those claims directly:

> With respect to Mr. Kranjac's breaches of . . . 6.01(B) . . . the analysis of Ms. Kranjac's conversion claim against Mr. Kranjac . . . applies to Ms. Kranjac's and Mr. Vogt's breach of contract claim as well: to wit, their lack of standing to bring a breach of contract claim directly against Mr. Kranjac inasmuch as his breaches resulted in material harm to [the Company] and their failure to assert a derivative claim on behalf of the [Company] . . . are procedural grounds which preclude them from moving forward on their breach of contract claim based on the contravention of . . . 6.01(B). *See Clifford Paper*, 2021 WL 2211694 (claims alleging a breach of an individual plaintiff's contract rights under LLC agreement are not direct because the resulting injury damages the LLC rather than the individual).[37]

The Award then noted that if Daniella and Vogt had asserted the claims derivatively, the Antisuit Provision would apply.[38] Once again, the Award viewed the Antisuit

---

Agreement or failing to do any act required by this Agreement, (iii) any act which would make it impossible to carry on the ordinary business of the Company, or (iv) any act without any consent or ratification which is required to be consented to or ratified by the Members pursuant to any provisions of this Agreement." LLC Agreement § 6.03. A provision that deprives an actor of the ability to exercise power on behalf of an entity renders any non-compliant action voidable. *See Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, — A.3d —, —, 2026 WL 184868, at *6–8 (Del. Jan. 20, 2026).

[37] Award ¶ 299 (citations omitted).

[38] *Id.* ¶ 324 ("Respondents take the alternative position that Ms. Kranjac 'can maintain' a derivative action on behalf of Capitol [sic] . . . . While there is no question that Ms. Kranjac as the holder of the 'Majority Approval of the Members' may

Provision as applying to derivative claims, consistent with the Company-Claim Reading.

The Award next turned to Daniella's request for "an award confirming that under [the Antisuit Provision], Mr. Kranjac is not authorized to commence legal proceedings on behalf of, or involving, [the Company] without Majority Approval."[39] That language simply tracks the Antisuit Provision without addressing how it operates. The Award cited its analysis of Daniella and Vogt's claims and concluded that the same reasoning applied to Mario's efforts to commence "this arbitration on behalf of [the Company] without . . . Majority Approval."[40] That statement referenced claims "on behalf of" the Company, *i.e.*, derivative claims. The Award then made the following declaration: "Claimant is not authorized to make any claims or commence litigation or arbitration proceedings . . . on behalf of, or involving, [the Company] without Majority Approval . . . . Section 6.01(B) . . . as modified by this declaration shall continue in full force and effect."[41] That language restated the Antisuit Provision, but with context showing that it referred to derivative claims. That reasoning is consistent with the Company-Claim Reading.

---

commence any arbitration proceedings involving Capital, she has not in fact brought any derivative claims on its behalf.").

[39] *Id.* ¶ 301.

[40] *Id.* ¶ 302.

[41] *Id.*

Notably, the Award did not apply the Antisuit Provision to (i) Daniella and Vogt's counterclaim for breach of the implied covenant of good faith and fair dealing inherent in the LLC Agreement,[42] (ii) Daniella and Vogt's counterclaim for defamation based on Mario's accusations of wrongdoing relating to the Company,[43] or (iii) Daniella and Vogt's contractual counterclaim for indemnification under the LLC Agreement.[44] Not applying the Antisuit Provision to those contract claims and personal claims is again consistent with the Company-Claim Reading.

Finally, the Award recognized that Mario could bring at least certain types of litigation "involving" the Company without first obtaining Majority Approval. One of the disputes in the arbitration involved Mario's right as a member to obtain books and records. The Award concluded that Daniella had not breached that provision and directed the parties to comply with the provision going forward. The operative language states:

> The parties to the [LLC Agreement] shall comply with Section 7.01 thereof in its entirety including the provision that "[a]ll Members and their duly authorized representatives shall have the right to inspect and copy any or all of the Company's books and records . . . during reasonable business hours upon three (3) business days' notice to the other Members, and shall have, on demand, true and full information of all matters affecting the Company."[45]

---

[42] *See id.* ¶¶ 311–316.

[43] *See id.* ¶¶ 333–338.

[44] *See id.* ¶¶ 345–351.

[45] *Id.* at 98, Declaration #6.

The Award authorized Daniella to limit Mario's rights to "view-only" files by taking action with Majority Approval,[46] but the Award did not cite the Antisuit Provision or say that Mario could only enforce his right to obtain books and records with Majority Approval. If Mario needed Majority Approval to obtain books and records, then the Company would not have to "comply with Section 7.01." The Award envisioned that Mario would be able to enforce his books-and-records right notwithstanding the Antisuit Provision, even though a books-and-records action would be a litigation or arbitration "involving" the Company. That interpretation comports with the Company-Claim Reading.

In addition to supporting the Company-Claim Reading, those rulings foreclose the Manager-Authority Reading. At no point does the Award distinguish between (i) a manager's ability to cause the Company to sue or to assert claims on behalf of or involving the Company and (ii) a member's ability to sue derivatively or assert claims involving the Company.

The Award's rulings also defeat the Every-Claim Reading. The Award permitted Mario to assert and enforce his right to books and records under the LLC Agreement without first obtaining Majority Approval, which he could not do under the Every-Claim Reading. The Award did not reference the Antisuit Provision when analyzing Daniella and Vogt's counterclaims that involved the Company, even though they would be covered under the Every-Claim Reading. By contrast, the Award

---

[46] *Id.*

24

mentioned the Antisuit Provision when addressing Daniella and Vogt's derivative claims. Despite dismissing those claims on other grounds, the Award observed that the Antisuit Provision would apply but that Daniella and Vogt could satisfy the requirement.[47]

The Award's rulings are consistent with the Company-Claim Reading. The Award only applied the Antisuit Provision to derivative claims that either Mario, Daniella, or Vogt asserted.

The Award concluded with a broad restatement of the Antisuit Provision. Declaration #7 states:

> [Mario] is not authorized to make any claims or commence litigation or arbitration proceedings . . . on behalf of, or involving, [the Company] . . . without Majority Approval . . . . Section 6.01(B) of the [LLC Agreement] as modified by this declaration shall continue in full force and effect.[48]

The Award's reasoning demonstrates that Declaration #7 adopted the Company-Claim Reading and modified the Antisuit Provision to adopt that interpretation.

## F. The Judgment

Over Mario's opposition, the New York Supreme Court confirmed the Award, resulting in a final judgment (the "Judgment").[49] Mario has appealed. He has also filed a separate motion to vacate the Judgment.

---

[47] *See id.* ¶ 324; *accord id.* ¶ 343 n.134. At Capital, Daniella owned a majority of the member interests and could deliver Majority Approval by herself.

[48] *Id.* at 98.

[49] Dkt. 11, Ex. A.

The Judgment states:

> Mario Kranjac is not authorized to make any claims or commence litigation or arbitration proceedings . . . on behalf of, or involving, [the Company] . . . without Majority Approval . . . . Section 6.01(B) of the [LLC Agreement] as modified by this declaration shall continue in full force and effect.[50]

That language tracks the Antisuit Provision and Declaration #7 from the Award. It therefore implemented the Company-Claim Reading and modified the Antisuit Provision to adopt that interpretation.

## G.     This Litigation

Mario filed this action on New Year's Eve 2025. He seeks an order dissolving the Company on the grounds that it is not reasonably practicable to carry on its business. He contends that he and Daniella are co-managers and deadlocked.

Mario sought expedition and a status quo order pending final disposition. The Company argued in response that Mario could not file any claim involving the Company without obtaining Majority Approval. Because he failed to obtain Majority Approval, the Company argued that the court must dismiss this lawsuit.

On the merits, the Company argued the rulings in the Judgment and Award foreclosed this action under principles of claim preclusion and issue preclusion. The Company argued that because of determinations made in the Award and implemented in the Judgment, Daniella exercised sole managerial authority over the Company. Mario and Daniella therefore could not be deadlocked.

---

[50] *Id.* at 5, ¶ xxxii.

The Company's arguments presented issues of law more appropriate for resolution on a motion to dismiss. With the parties' consent, the court converted the proceedings on the status quo order into proceedings on a motion to dismiss the petition under Rule 12(b)(6).

## II.    LEGAL ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests whether the complaint's allegations state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[51] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[52] Delaware's "governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[53]

The petition asserts a straightforward claim for dissolution. Mario alleges that he and Daniella are co-managers of the Company, that they are deadlocked on

---

[51] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[52] *Id.*

[53] *Id.* at 537 n.13.

multiple issues, and that it is not reasonably practicable to carry on the Company's business.

## A.      Dismissal Based On The Antisuit Provision

The Company raises the Antisuit Provision as a threshold defense. The Company invokes the Every-Claim Reading and contends that an action for dissolution plainly involves the Company. Therefore, they say, Mario cannot sue for dissolution without Majority Approval. Because he failed to obtain Majority Approval, the Company argues that the case must be dismissed. That argument fails because the Judgment and the Award adopt the Company-Claim Reading. Mario's claim for dissolution is a direct claim.

The Company's argument depends on the Every-Claim Reading, which the Company contends that the Award adopted and the Judgment implemented. According to the Company, that reading binds Mario and this court under principles of issue preclusion. The Company is correct that issue preclusion applies, but not about the Award adopting and the Judgment implementing the Every-Claim Reading. The Award adopted and the Judgment implemented the Company-Claim Reading.

Under the United States Constitution, "Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state."[54] The Full Faith and Credit Clause "requires every state to give to the judgments of

---

[54] U.S. Const. art. IV, § 1.

another state, assuming jurisdiction by the state entering the judgment over the parties and subject matter, the same effect which that judgment has in the state in which it was rendered."[55]

Here, New York is the rendering jurisdiction. Under New York law, issue preclusion "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same."[56] "The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action."[57] "[T]he burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in [the] prior action or proceeding."[58]

Mario accepts that the Judgment is final for purposes of claim preclusion. He argues instead that the Judgment cannot have preclusive effect because the Company

---

[55] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1218 (Del. 1991) (internal quotation marks omitted).

[56] *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500 (N.Y. 1984).

[57] *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349 (N.Y. 1999).

[58] *Ryan*, 62 N.Y.2d at 501.

29

was not a party to the arbitration or the confirmation proceeding. For issue preclusion, that does not matter. The question is whether Mario had a full and fair opportunity to litigate the scope of the issue in the prior action. He plainly did.

Mario also argues that the Judgment cannot have preclusive effect because the arbitration did not involve a claim for judicial dissolution. That is true, and the Company does not argue otherwise. The Company argues instead that whether the proceedings involve the same claim does not matter for preclusion. The Company maintains that the Award adopted the Every-Claim Reading, that the Judgment implemented that reading, and that this court cannot adopt a different interpretation.

The Company is correct that this court must apply the Antisuit Provision as interpreted by the Award and implemented in the Judgment. The absence of a claim for dissolution in the arbitration does not matter. For the reasons explained in the Factual Background, the Award adopted the Company-Claim Reading and the Judgment implemented that reading. The Award cannot accommodate the Every-Claim Reading, and the Judgment could not have implemented an interpretation that the Award forecloses.

Under the Company-Claim Reading, the operative question is whether a claim for dissolution is a claim belonging to the Company such that a member must assert it derivatively. If so, then the Antisuit Provision applies. If not, then Mario can bring the claim notwithstanding the Antisuit Provision.

30

In *Tooley*,[59] the Delaware Supreme Court established the principal test for determining whether a stockholder's claim is derivative or direct. In that decision, the justices stated:

> We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?[60]

The Delaware Supreme Court subsequently clarified that *Tooley* and its progeny "deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively."[61] *Tooley* did not obviate the need to address an "important initial question": "[D]oes the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?"[62]

Direct claims are one category of claims that investors in Delaware entities bring.[63] Direct claims encompass causes of action that are associated with the equity

---

[59] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

[60] *Id.* at 1033.

[61] *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015).

[62] *Id.* at 180.

[63] In addition to claims to enforce rights under the operative statutes and the constitutive documents of an entity, investors may possess claims that belong to them personally. "Quintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud

31

interest in the entity—be it a share or a member interest—and which the owner of the equity interest can bring.[64] For stockholders in a corporation, direct claims include the causes of action conferred on stockholders by specific statutory provisions of the DGCL.[65] Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws.[66] The availability of a direct cause of action in these situations comports with Delaware's longstanding recognition that the DGCL, the certificate of incorporation, and the bylaws together constitute a multi-party contract among the directors,

---

in connection with the purchase or sale of shares." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015).

[64] *See Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 680 (Del. 2020).

[65] *See, e.g.*, 8 *Del. C.* § 205 (right to bring action to validate a defective corporate act); *id.* § 231(c) (right to bring action challenging ballot, proxies, or votes); *id.* § 262(a) (right to bring appraisal proceeding).

[66] *See Tooley*, 845 A.2d at 1037–39; *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010); *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *7, *13–14 (Del. Ch. May 5, 2010); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE); *Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del. Super. Feb. 21, 2011); *see also Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *7 (Del. Ch. Jan. 18, 1996) (Allen, C.) (observing that if a lawsuit "seeks a remedy to compensate for the invasion of a property right of a stockholder," then the claim is direct and "the recovery will be for the stockholder"); Garrard Glenn, *The Stockholder's Suit—Corporate and Individual Grievances*, 33 Yale L.J. 580, 592 (1924) (explaining that a suit to enforce the constitutive corporate agreements is an individual, not a derivative, claim). As *Tooley* specifically held, stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders had the same right and suffered the same injury. *Tooley*, 845 A.2d at 1039. *See generally Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1105–09 (Del. Ch. 2014).

officers, and stockholders of the corporation.[67] As parties to the contract, stockholders can enforce it.

*Tooley* recognized and reinforced the importance of distinct stockholder rights. Before *Tooley*, Delaware Supreme Court decisions had used the concept of special injury to determine when a plaintiff could sue directly.[68] A special injury was defined as a wrong "separate and distinct from that suffered by other shareholders . . . or a wrong involving a contractual right of a shareholder."[69] If the plaintiffs had suffered special injury, then the plaintiffs could sue directly, even if the same wrong injured the corporation as well.

*Tooley* discarded the term "special injury," but *Tooley* did not overrule the results in the cases that used that term or alter the longstanding principle that a stockholder suffered injury when its contractual rights were breached. Instead, *Tooley* rejected an argument that defendants regularly advanced in favor of

---

[67] *E.g.*, 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation . . . ."); *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) (Strine, C.) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . ."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders.").

[68] *See Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986).

[69] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch.) (internal quotation marks omitted), *aff'd*, 500 A.2d 1346 (Del. 1985).

characterizing such claims as derivative, namely that if all of the stockholders held the same right, and if all of the stockholders were injured equally, then the claim should be regarded as derivative. *Tooley* explained that this argument was incorrect and that claims of this type remain direct.

*Tooley* involved a third-party, two-step acquisition in which the target corporation consented to the acquirer postponing the closing of the first-step tender offer by twenty-two days. Stockholder plaintiffs sued, claiming that the stockholders of the target corporation had a contractual right to have the offer close on time. The plaintiffs claimed that if the offer had closed on time, then the stockholders would have gotten their money faster. As damages, the plaintiffs sought the time value of money that the stockholders lost from the delay.

The Court of Chancery dismissed the complaint, reasoning that the claims were derivative. The Court of Chancery held that there was no meaningful distinction between the contract rights of the tendering and non-tendering stockholders, such that they all held parallel contract rights. The decision then reasoned that "[b]ecause this delay affected all DLJ shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action at most."[70] In other words, the Court of Chancery accepted the argument that it was appropriate to treat a

---

[70] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *4 (Del. Ch. Jan. 21, 2003).

contractual claim as derivative if all of the stockholders held the same contractual rights and all suffered the same injury to their parallel contractual rights.

The Delaware Supreme Court reversed. The high court conscientiously conceded that the concept of special injury had become "amorphous and confusing."[71] The Delaware Supreme Court traced much of the confusion to *Bokat*, which held that "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation."[72] *Tooley* described this statement as both "confusing and inaccurate."[73]

> It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. *That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.*[74]

As demonstrated by this passage, the *Tooley* decision sought to clarify *Bokat* by distinguishing between (i) an injury that fell *indirectly* on all stockholders equally,

---

[71] *Tooley*, 845 A.2d at 1035.

[72] *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del. 1970).

[73] *Tooley*, 845 A.2d at 1037.

[74] *Id.* (second emphasis added).

which supported a derivative claim, and (ii) an injury that affected stockholders *directly*, even if all stockholders suffered the same injury, which gave rise to a direct claim.

Having revisited the concept of special injury, the Delaware Supreme Court surveyed the post-*Bokat* decisions that addressed the distinction between direct and derivative claims. Despite having rejected the concept of special injury, the Delaware Supreme Court re-affirmed its precedents as having reached correct results on the facts presented.[75] Far from overruling those cases, *Tooley* reinforced them by clarifying that stockholders continue to suffer direct injury and can sue individually when they invoke their statutory or contractual rights, even if all stockholders possessed the same rights and suffered parallel injuries.

*Tooley*'s outcome confirms this. The Delaware Supreme Court ruled that the stockholders' claim was *not* derivative, even though all of the stockholders had the same contractual right to a timely closing and the defendants' action affected all stockholders proportionately. The Delaware Supreme Court reached this conclusion because the right that was implicated belonged to the stockholders. This holding confirmed the direct nature of a stockholder's cause of action for injury to its contractual rights as a stockholder, even when a plaintiff asserts the same contractual right in a representative capacity on behalf of all stockholders.

---

[75] *Id.* at 1037–39.

A member in a Delaware LLC possesses analogous rights. The universe of

direct claims starts with the causes of action granted to members by specific statutory

provisions of the LLC Act.[76] It also includes causes of action to enforce the contract

rights that the members possess under the LLC agreement.[77] Alternative entity

agreements "are a type of contract."[78] By statute, members, managers, and the LLC

itself are parties to and bound by the limited liability company agreement, regardless

of whether or not they sign it:

> A member . . . of a limited liability company. . . is bound by the limited
> liability company agreement whether or not the member . . . executes
> the limited liability company agreement. A limited liability company . .
> . is not required to execute its limited liability company agreement. A
> limited liability company . . . is bound by its limited liability company
> agreement whether or not the limited liability company . . . executes the
> limited liability company agreement.[79]

Just as stockholders can sue directly to enforce rights under the charter, bylaws, and

---

[76] *See, e.g.*, 6 *Del. C.* § 17-110(a) (right to bring action to "determine the validity of any admission, election, appointment or removal or other withdrawal of a general partner of a limited partnership," and "the right of any person to become or continue to be a general partner"); *id.* § 17-205(b) (right to bring action to compel execution of partnership agreement or amendment); *id.* § 17-207 (right to recover damages from a general partner for false statement in certificate contemplated by Delaware Limited Partnership Act).

[77] *See Allen*, 90 A.3d at 1109; *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010); *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 151, 154 (Del. Ch. 2003); *In re Cencom Cable Income P'rs, L.P.*, 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000).

[78] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[79] 6 *Del. C.* § 18-101(9).

provisions of the DGCL, members can sue directly to enforce contractual rights in the LLC Act and limited liability company agreement.[80] A member's ability to enforce these rights comports with "the policy of [the LLC Act, which is] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[81]

That does not mean that every claim for breach of an alternative entity agreement is a direct claim. The two-part test that the Delaware Supreme Court created in *Tooley* primarily seeks to address "the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits subject to . . . demand excusal."[82] Sometimes drafters create contractual regimes designed to replace the fiduciary duties that an alternative entity agreement eliminates. The Delaware Supreme Court has called for using *Tooley* to determine when efforts to enforce those contract rights are direct or derivative.[83]

---

[80] *See Allen*, 90 A.3d at 1109; *Brinckerhoff*, 986 A.2d at 383; *Anglo Am. Sec. Fund*, 829 A.2d at 151, 154; *Cencom*, 2000 WL 130629, at \*6.

[81] 6 *Del. C.* § 18-1101(b); *accord Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999).

[82] *NAF Hldgs.*, 118 A.3d at 179.

[83] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016).

For a Delaware LLC, the LLC Act codifies the concept of a derivative action.[84] The LLC derivative action is a statutory descendant of the corporate derivative action. "Devised as a suit in equity, the purpose of the derivative action was . . . to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"[85] Today, however, "'[a]ny claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty."[86]

A right to assert a claim for judicial dissolution is part of the bundle of property rights that a member possesses. The statute states: "On application by or for a

---

[84] 6 *Del. C.* § 18-1001.

[85] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).

[86] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999) (Strine, V.C.)); *see also Ross v. Bernhard*, 396 U.S. 531, 542–43 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination"); *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183–84 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93 (1995) (denying motion to dismiss a derivative claim for breach of contract against the United States); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 13.10, at 13–27 (4th ed. Supp. 2025) (explaining that a derivative action can be used to bring any corporate right that the corporation "has refused for one reason or another to assert").

member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[87] Any *member* can pursue a claim for judicial dissolution. The right to pursue dissolution follows member status and is direct. Conceptually, the right to pursue a claim for judicial dissolution is akin to the right to enforce a right to books and records.

Under the binding Company-Claim Reading, the Antisuit Provision does not apply to the claim for judicial dissolution that Mario has pursued in this action. The claim for judicial dissolution is a direct claim under the LLC Act that Mario can bring as a member.

## B.     Does The Petition State A Claim For Dissolution?

Although the Antisuit Provision does not block Mario from pursuing a claim for judicial dissolution, that does not mean he has stated a claim on which relief can be granted. To the contrary, the Award's binding determinations make stating a claim impossible.

An order of judicial dissolution is appropriate if it is "not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[88] Dissolution may be appropriate where "the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to

---

[87] 6 *Del. C.* § 18-802.

[88] *Id.*

operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill."[89] "Even if a business can function, the analysis considers whether the entity is otherwise stuck within a residual, inertial status quo that prevents it from operating or from furthering its stated business purpose."[90]

There is no "blueprint for determining whether it is 'not reasonably practicable' for an LLC to continue."[91] But "several factual circumstances indicative of a lack of 'reasonable practicability' have pervaded the case law."[92] One situation involves (1) deadlock at the governing-body level, between members in a member-managed entity or managers in a manager-managed entity and (2) no means of navigating around the deadlock.[93]

The fact that a deadlock at the governing-body level may permit a CEO or other senior officer to continue operating the company on a day-to-day basis, free of oversight, does not mean that it remains reasonably practicable to carry on the

---

[89] *Gibson v. Konick*, 2024 WL 3370927, at *5 (Del. Ch. July 10, 2024) (internal quotation marks omitted).

[90] *Id*. (cleaned up).

[91] *In re GR BURGR, LLC*, 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017).

[92] *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021) (cleaned up) (quoting *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE)).

[93] *See Fisk Ventures*, 2009 WL 73957, at *4; *accord Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2009 WL 4052681, at *5 (Del. Ch. Nov. 12, 2009).

business. In that setting, an officer may be managing the company because of the power vacuum the deadlock creates, but the officer is not managing the company in accordance with the governance structure set forth in its constitutive agreement.[94]

Mario claims this is a classic situation where a two-member board faces deadlock. He relies on the General-Authority Provision and argues for a three-tier concept of authority involving day-to-day issues, board-level issues, and stockholder-level issues. Under that view, a board-level deadlock would exist, and Mario would have stated a claim.

The stronger reading of the LLC Agreement, however, is that it adopted a two-level structure that distinguishes between (1) day-to-day issues and (2) material or non-day-to-day issues that require member consent. The Award interpreted the LLC Agreement in that fashion, and the Judgment made that interpretation binding on this court.

The Award went further and made clear that as to day-to-day issues, Mario

---

[94] *See Carlisle*, 114 A.3d at 607 ("The Initial LLC Agreement made the Board the singular manager of the Company. Because its four members are deadlocked, the duly authorized manager of the Company cannot exercise its statutory and contractual authority or carry out its obligation to manage and direct the business and affairs of the entity. Brubaker may be managing the Company because of the power vacuum created by the deadlock, but Brubaker is not the Board. Under the prevailing state of affairs, the Company is operating contrary to the governance structure set forth in its constitutive agreement."); *Haley v. Talcott*, 864 A.2d 86, 96 (Del. Ch. 2004) ("Talcott insists that the LLC can and does continue to function. . . . But that reality does not mean that the LLC is operating in accordance with the LLC Agreement. Although the LLC is technically functioning at this point, this operation is purely a residual, inertial status quo that just happens to exclusively benefit one of the 50% members, Talcott.").

has no authority, despite his nominal status as manager. The Award ruled that "whatever management decisions [Mario] believes that he needs to make on behalf of or regarding Dynamk would fall into the category of material or non-day-to-day decisions which require 'Member consent,' that is Majority Approval."[95] The Award later held that Mario "has no unilateral authority to make any management determinations or decisions . . . on behalf of, or regarding [the Company] . . . without Majority Approval."[96] The Judgment made that interpretation binding on this court.

Those rulings make it impossible for Mario to claim deadlock warranting dissolution. Under the Award and Judgment, Daniella effectively has sole authority over day-to-day issues. There cannot be a manager-level deadlock given the Award and Judgment's allocation of authority to Daniella.

There also cannot be a member-level deadlock. Mario, Daniella, and Vogt each hold a minority interest. Any two of them can deliver Majority Approval.[97]

Seeking to turn the Award in his favor, Mario argues that the arbitrator found that "the Dynamk LLCs are deadlocked."[98] That was before the arbitrator made her

---

[95] Award ¶ 171.

[96] *Id.* ¶ 172; *accord id.* at 97, Declaration #5.

[97] There is no deadlock at Capital either. There, Daniella holds a majority of the member interests and can deliver Majority Approval.

[98] Award ¶ 152 n.62; *see id.* ¶ 99 n.45 ("As the DLS Fund reached its Full Investment Date and is fully invested as of September 2021 and the Dynamk LLCs are deadlocked, Avant does not (and cannot) 'compete' with Dynamk.").

rulings on the scope of Daniella and Mario's authority. After the issuance of the Award and its confirmation as a Judgment, there can be no deadlock.

It is not reasonably conceivable that there could be a deadlock. Mario has failed to state a claim for judicial dissolution.

### III.    CONCLUSION

The motion to dismiss is granted. Although the Antisuit Provision does not bar Mario's lawsuit, he cannot state a claim for dissolution because under the binding rulings reflected in the Award and Judgment, it is no longer reasonably conceivable that there could be a deadlock.